# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

JOHN TROY,

       Petitioner,

v.                                                          Case No. 8:11-cv-796-T30-AEP

SECRETARY OF DEPARTMENT
OF CORRECTIONS,

       Respondent.

_____/

## ORDER

John Troy, a State of Florida inmate under sentence of death, seeks habeas corpus

relief pursuant to 28 U.S.C. § 2254 and challenges the validity of his state conviction for

first-degree murder.[1] Respondent argues that Troy fails to state a federal constitutional claim

or meet the threshold requirements of 28 U.S.C. § 2254(d) and (e).  Upon review, the court

concludes the petition should be DENIED.

## Procedural Background

A jury convicted Troy of the first-degree murder of Bonnie Carroll ("Carroll") and the

state trial court judge imposed a death sentence.  Troy appealed.  The Florida Supreme Court

affirmed Troy's conviction and sentence.  (Doc. 17, Ex. A46).  *See Troy v. State*, 948 So. 2d

635 (Fla. 2006).  Troy filed a petition for writ of certiorari in the United States  Supreme

---

[1] Troy was convicted of multiple offenses with two different victims (Traci Burchette and Bonnie Carroll).  He received a death sentence for the murder of Bonnie Carroll.  Troy in his federal petition challenges only his first-degree murder conviction and death sentence.

Court, which petition the Court rejected.  (Doc. 17, Ex. B3).  *See Troy v. Florida*, 551 U.S. 1135 (2007).

Troy next filed a state motion to vacate his judgment of conviction and death sentence pursuant to Fla. R. Crim. P. 3.851.  (Doc. 17, Ex. C3, pp. 511-71).  While the motion was pending, Troy filed a motion pursuant to Fla. R. Crim. P. 3.575 seeking an order allowing post-conviction counsel to interview a juror to determine if the juror had an undisclosed connection to Carroll's family.  (Doc. 17, Ex. C4, pp. 680-86).  The state post-conviction court ultimately denied the Rule 3.851 motion (Doc. 17, Ex. C5, pp. 816-33) and granted the Rule 3.575 motion (Doc. 17, Ex. C7, pp. 1305-07).[2]

Troy appealed the denial of his Rule 3.851 motion.  The Florida Supreme Court affirmed the denial of relief.  (Doc. 17, Ex. C13).  *See Troy v. State*, 57 So. 3d 828 (Fla. 2011).  Troy's subsequent motion for rehearing was rejected.  (Doc. 17, Ex. C15).

Troy filed the instant Section 2254 petition on April 12, 2011.  Respondent does not challenge the petition's timeliness.  Troy presents thirteen grounds for relief alleging ineffective assistance of trial counsel and trial court error.

### <u>Facts</u>[3]

John Troy was indicted for [the] first-degree murder of Bonnie Carroll, as well as armed burglary and armed robbery; a fourth count, attempted sexual battery

---

[2]  The state post-conviction court conducted an interview with the juror and Carroll's father, both of whom testified that they were not acquainted with one another.  The state post-conviction court judge did not enter an order after the interview because Troy never challenged the juror's answers at the hearing.

[3]  This factual summary is taken from the Florida Supreme Court's order affirming Troy's conviction on direct appeal.  *Troy v. State*, 948 So. 2d 635 (Fla. 2006).

with a weapon upon Carroll, was later added by information.  Troy was separately charged by information for the related armed burglary, aggravated battery, armed kidnapping, and armed robbery of Traci Burchette.  Trial by jury resulted in guilty verdicts on all counts in both cases.  Following a penalty phase, the jury recommended a death sentence for the murder by an eleven-to-one vote and the trial court imposed a death sentence.

The evidence presented at trial indicated that on September 12, 2001, at approximately 5:30 p.m., the nude and dead body of Bonnie Carroll, twenty, was found in her home in the Timberchase Apartments in Sarasota.  Debbie Ortiz, Carroll's mother, discovered her daughter's body.  Ortiz had last seen Carroll alive at approximately 11:15 p.m. on September 11, 2001, when Carroll left Ortiz's home with Carroll's two-year-old daughter Cynthia.

Associate medical examiner Dr. Michael Hunter arrived on the scene of the homicide at 2:05 a.m. on September 13.  A knife was discovered in close vicinity to Carroll's body, and an electrical cord was found tied around her thigh.  Dr. Hunter determined that Carroll was murdered around midnight on September 12.  Dr. Hunter also observed a cloth tied around the victim's neck, numerous stab wounds to the front of the body, large incised wounds to the neck area, and blunt force impact injuries around the face.  During the autopsy, Dr. Hunter found a piece of cloth inside Carroll's mouth that had been folded over and wedged firmly in the back of her throat.  Blood on the fabric indicated that she was alive when it was inserted.  The autopsy also revealed another cloth loosely tied around Carroll's neck and petechial hemorrhages in the eyes - possibly but not conclusively indicating strangulation.  Carroll suffered multiple areas of blunt impact injuries to her face, chin, and scalp, including small fresh injuries to the external genitalia and thighs.  There were two very small areas of vascular dilation on her external genitalia, but no internal injuries to that area.  No semen was identified, but at trial Dr. Hunter noted that all the factors were consistent with someone attempting to sexually batter the victim before she was killed.  Carroll's body had suffered a total of fifty-four injuries, including forty-four stab wounds, three areas of incise wounds to the neck, at least seven impact injuries to the face, and multiple defense wounds on the hands.

A knife blade was also broken off within Carroll's body, which Dr. Hunter became aware of via x-ray.  A bladeless knife handle was recovered from the counter of Carroll's bathroom.  It contained the blood of both Troy and Carroll.  Heather Velez, a crime lab microanalyst with the Florida Department of Law Enforcement (FDLE), testified that the bladeless knife handle and the knife

blade had at one time been a single piece. Carroll's blood was also found on a steak knife, indicating that two weapons were associated with her injuries. There was no evidence of drugs in her system, and her blood alcohol level of 0.037 was consistent with having had a glass of wine.

John Troy also resided at Timberchase Apartments with his mother, Debra Troy, his girlfriend Marilyn Brooks, and Brooks' daughter. Troy was released from prison on July 25, 2001, approximately five weeks before the murder, after serving a sentence for armed robbery. Upon his release, Troy was placed on two years' probation. His conditional release mandated that he submit to regularly scheduled drug testing; Troy admitted to his probation officer that he would be unable to pass his first scheduled drug test because he had smoked marijuana while incarcerated. The drug test was then rescheduled for September 11, 2001, and on that date, Troy tested positive for cocaine and was informed by his probation officer that he would soon be reincarcerated for violation of probation.

When he returned to his residence after his failed drug test, Troy got into a series of arguments with Brooks before leaving his apartment to visit Melanie Kozak's residence, where he used cocaine. Brooks testified that Troy took a kitchen knife with him and did not return. On September 11 and 12, Troy made a total of four visits to see Kozak - three before the murder and one after. During each visit, Troy and Kozak ingested cocaine together.

Troy was also involved in an incident with his downstairs neighbor, Karen Curry, on the evening of Carroll's murder. At approximately 12:30 a.m. on September 12, Troy pounded on her rear sliding glass door. She told him to go away, and called the police. Officer Derek Gilbert responded to Curry's call. Officer Gilbert went to the Troy apartment to investigate, but Troy was not home.

Carroll's death occurred some time between Troy's encounter with Curry and a 2 a.m. visit with Kozak. After Carroll's death, Troy stopped by Kozak's house, ingested some cocaine, then drove around in Carroll's car and decided to visit Traci Burchette, a psychiatric nurse and friend of Troy's mother. [FN1]. Troy parked a couple of streets away from Burchette's house, and then went into her backyard and picked up a two-by-four board. Concealing the board, Troy knocked on Burchette's front door at approximately 6:30 a.m. When she awoke and came to the door, Troy said that his car had broken down and he needed to use her telephone. She invited him in and Troy pretended to call a friend for a ride. Burchette stated that he appeared perfectly normal.

4

She made him coffee, and Troy asked to use her computer.  When Burchette leaned down to turn the computer on, she was attacked by Troy from behind. In the attack, Burchette lost fingernails on both hands and broke her knuckles while suffering a skull fracture.  Troy bound and gagged her, took her car keys and her ATM card, and left.

> FN1. Troy and his mother stayed at Burchette's house for a week in August 2001.

Bank records indicated that Troy attempted to use Burchette's ATM card at a Sun Trust Bank in Arcadia at 8:24 a.m.  Troy then headed south on Interstate 75 towards Naples.  Meanwhile, Burchette managed to call 911; police arrived and she gave a description of Troy and her car.  Troy was stopped in Naples by local police mid-afternoon on September 12 in Burchette's car with a female passenger.  Police questioned the passenger and located the two-by-four board used in Burchette's attack along the highway near Ft. Myers.  DNA testing later revealed Burchette's blood on the two-by-four.

At the time of his arrest, Troy was wearing a pair of tennis shoes, blue jeans, a T-shirt, and a baseball cap.  Pursuant to trial stipulations regarding DNA evidence, the shoes contained Carroll's blood, the blue jeans contained both Carroll and Burchette's blood, and the T-shirt tested positive for Burchette's blood.  Also, material removed from Carroll's fingernails disclosed a mixture of Troy's DNA.  Two pieces of broken glass were recovered from Carroll's bedroom and tested for DNA.  One piece, containing her blood, was found lying on her bra.  The other piece of glass, which tested positive for Troy's blood, was found lying to the left of Carroll's body. Latent print examiner Jackie Scogin identified a match of Troy's fingerprint on a glass found on Carroll's kitchen counter.

At the outset of trial, with Troy's consent, defense counsel acknowledged in his opening statement both that Troy killed Carroll and that he had attacked Burchette.  However, he claimed Troy was only guilty of second-degree murder on the basis that the killing was neither premeditated nor committed during the perpetration of any felony.  Although Troy did not contest most of the charges, the defense, in its case and on cross-examinations, introduced physical evidence, photographs, and testimony to corroborate Troy's statements.  Specifically, the defense substantiated that Troy was in Carroll's apartment by invitation, that the two of them were socializing prior to their argument which culminated in her murder, and that Troy used drugs while in her apartment.  There was no evidence of forced entry into Carroll's apartment.

Despite the defense claims, Troy was found guilty of first-degree murder and all other charges.

In the penalty phase of the trial, the State introduced evidence of Troy's four prior felony convictions, including three armed robbery convictions and one conviction for aggravated assault with a weapon, his four contemporaneous convictions resulting from the Burchette battery, his conditional release status in both Florida and Tennessee, and three victim impact statements.

The defense's penalty phase presentation focused on Troy's upbringing, his behavior and adjustment in prison, his potential for rehabilitation if sentenced to life imprisonment, and the impact of the tragic national events of September 11, 2001, which the defense claimed resulted in Troy's explosion of violence. In addition to the numerous family members and other character witnesses who testified on Troy's behalf, Dr. Michael Maher, a clinical and forensic psychiatrist, also gave expert testimony concerning the effects of Troy's difficult upbringing. He testified regarding (1) Troy's unstable, physically and emotionally abusive childhood; (2) Troy's being sexually molested at age thirteen by an adult male teacher, which resulted in humiliation and ostracism after Troy was the key witness at the teacher's high-publicity trial in a small town; (3) Troy's arrested psychological development; (4) Troy's lifelong depressive illness; (5) Troy's chronic drug addiction from an early age; (6) Troy's response to the national events of September 11; and (7) Troy's acute intoxication at the time of Carroll's murder.

At the *Spencer* [FN2] hearing, held on November 21, 2003, defense counsel called Detective Gr[o]doski of the City of Sarasota.  Defense counsel asked Gr[o]doski, who took a previously suppressed statement from Troy the day after the murder, [FN3] two questions:  (1) Whether Troy had accepted responsibility for the death of Carroll, and (2) whether Troy had expressed remorse for his crimes.  Gr[o]doski answered both questions in the affirmative.  Thereafter, the State argued that, by defense counsel questioning Gr[o]doski about some aspects of the suppressed confession, the State should be allowed to inquire about the entire confession despite its prior suppression.  The trial judge agreed.

> FN2.  *Spencer v. State,* 615 So. 2d 688 (Fla.1993).

> FN3. Prior to trial, Troy moved to suppress his confession given to Detectives Gr[o]doski and Wildtraut of the Sarasota Police Department on September 13, 2001.  Troy argued that the

confession was obtained in violation of his constitutional rights, since he was interrogated without being provided an attorney after he had invoked his rights. The trial judge ruled that the statements to the detectives were to be suppressed, available only for impeachment purposes if Troy decided to testify at trial.

Troy's statement to Gr[o]doski indicated that he tied the victim with an extension cord and that he knew Carroll would call the police if he let her go. Troy said that he and Carroll began fighting in the living room, but wrestled their way back to the bedroom, and that Carroll was talking loudly, and he shoved something into her mouth to quiet her. They wrestled on the bed, and he then cut electrical cords to tie her hands and feet. Troy asked Carroll if she wanted to have sexual relations, and she replied affirmatively. Carroll then got her hands free and the two began fighting, and Troy began stabbing her with a knife and with broken glass. Troy also stated that he had brought one of the knives he used, and that he took the other from her kitchen. After thinking he had killed Carroll, Troy went into the kitchen to get her money and keys out of her purse; he then heard movement in the bedroom and returned to find her still alive and trying to sit up, at which point he cut her throat. Troy denied having sexual intercourse with Carroll, but admitted that he took her into the bathroom to "clean her up" before sex, and he indicated that the two were going to have sex. Troy admitted that he tied her hands and feet, and that he had to cut her clothing off because she was tied up and unable to remove it. While Troy stated he realized he would have to "eliminate" Carroll as a witness, he denied any type of sexual battery.

Detective Gr[o]doski also testified that Troy told the officers he had taken heroin, cocaine, powdered cocaine and Paxil on the night of the crimes. Troy said the argument with Carroll began when she made disparaging remarks about Marilyn Brooks. He also stated he used cocaine while in Carroll's apartment. He thought the Paxil influenced his actions on the night of the crimes. Gr[o]doski reiterated that Troy expressed remorse, saying he felt repulsed by what he had done. Finally, Gr[o]doski testified that Troy was not crying, ill, or vomiting, and was able to calmly explain what had occurred. At the close of the *Spencer* hearing, Troy offered two allocutions of remorse, one for Tracie Burchette and one for the trial court. He had prepared one for the family of Bonnie Carroll, but they requested that he not offer it.

The trial court imposed a death sentence and found four aggravating factors: (1) The capital felony was especially heinous, atrocious, or cruel (HAC) (great weight); (2) Troy was previously convicted of a capital felony or a felony

7

involving the use of or threat of violence (considerable weight); (3) the capital felony was committed by a person previously convicted of a felony and under sentence of imprisonment or placed on community control or on felony probation (considerable weight); and (4) the capital felony was committed during the commission or attempt to commit a robbery or sexual battery (considerable weight).  [FN4].

> FN4.  The trial court also found the pecuniary gain aggravator, but noted that it would be improper doubling to consider it with the robbery aggravator.

In mitigation, the trial court found both of the statutory mental mitigating circumstances, according great weight to impaired capacity and moderate weight to extreme mental or emotional disturbance.  The trial court also found fifteen nonstatutory mitigating factors - all of which received little weight.  These mitigating factors included:   (1) Troy's dysfunctional family background; (2) Troy's positive personal characteristics and actions, including protecting a Tennessee correctional officer during a prison incident; (3) Troy's being sexually molested; (4) Troy's "triple addiction" to alcohol, cocaine, and marijuana; (5) Troy's lifelong history of mental and emotional problems; (6) Troy's potential for positive contributions if sentenced to life imprisonment; and (7) Troy's expressions of remorse.

*Troy v. State*, 948 So. 3d 635, 638-42 (Fla. 2004).

## MERITS

Troy has exhausted all of the grounds presented in his federal petition and all of the grounds are entitled to review on the merits.

### Standard of Review

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), governs this proceeding.  *Wilcox v. Florida Dep't of Corr.*, 158 F.3d 1209, 1210 (11th Cir. 1998), *cert. denied*, 531 U.S. 840 (2000).  Section 2254(d), which creates a highly deferential standard for federal court review of state court adjudications, states in pertinent part:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000), the Supreme Court interpreted this deferential standard:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied--the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal Law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

"The focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, . . . an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. at 694. *See Brown v. Head*, 272 F.3d 1308, 1313 (11th Cir. 2001) ("It is the objective reasonableness, not the correctness *per se*, of the state

court decision that we are to decide."). The phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. at 412.

The purpose of federal review is not to re-try the state case. "The [AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Federal courts must afford due deference to a state court's decision. "AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, ____ U.S. ____, 130 S. Ct. 1855, 1866 (2010).

Troy bears the burden of overcoming a state court factual determination by clear and convincing evidence. "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). This presumption of correctness applies to a finding of fact, but not to a mixed determination of law and fact. *Parker v. Head*, 244 F.3d 831, 836 (11th Cir.), *cert. denied*, 534 U.S. 1046 (2001). The state court's rejection of Troy's post-conviction claims warrants deference in this action.

### **Standard of Review for Ineffective Assistance of Counsel Claims**

*Strickland v. Washington*, 466 U.S. 668 (1984), governs an ineffective assistance of counsel claim:

The law regarding ineffective assistance of counsel claims is well settled and well documented.  In *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Supreme Court set forth a two-part test for analyzing ineffective assistance of counsel claims.  According to *Strickland*, first, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Strickland*, 466 U.S. at 687, 104 S. Ct. 2052.

*Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998).

*Strickland* requires proof of both deficient performance and consequent prejudice. *Strickland*, 466 U.S. at 697 ("There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."); *Sims*, 155 F.3d at 1305 ("When applying *Strickland*, we are free to dispose of ineffectiveness claims on either of its two grounds.").  "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Strickland*, 466 U.S. at 690.  "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  466 U.S. at 690.  *Strickland* requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."  466 U.S. at 690.

Troy must demonstrate that counsel's error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment

of a criminal proceeding if the error had no effect on the judgment."  466 U.S. at 691-92.  To meet this burden, Troy must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  466 U.S. at 690-91.  Troy cannot meet his burden merely by showing that the avenue chosen by counsel proved unsuccessful.

> The test has nothing to do with what the best lawyers would have done.  Nor is the test even what most good lawyers would have done.  We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial . . . .  We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992).  *Accord Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) ("To state the obvious:  the trial lawyers, in every case, could have done something more or something different.  So, omissions are inevitable . . . .  [T]he issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'") (*en banc*) (quoting *Burger v. Kemp*, 483 U.S. 776, 794

(1987)).  *See also Jones v. Barnes*, 463 U.S. 745, 751 (1983) (counsel has no duty to raise a frivolous claim).

## I.  GUILT PHASE CLAIMS

### Ground One

Troy's trial counsel filed a pre-trial motion to declare unconstitutional Section 775.051, Florida Statutes, which prohibits the use of a voluntary intoxication defense to a specific intent crime.  (Doc. 17, Ex. A3, pp. 486-89, 510-12).  The state trial court denied the motion.  (Doc. 17, Ex. A4, p. 672).  Troy argues in this federal petition, as he did on direct appeal in the state court,[4] that Section 775.051 violates his rights to due process and equal protection under both the United States Constitution and the Florida Constitution.[5]

The Florida Supreme Court rejected this ground on direct appeal:

Troy first argues that section 775.051, which prevented him from asserting a defense of voluntary intoxication, is constitutionally invalid because it operates

---

[4]  Troy also presented this ground to the United States Supreme Court in his petition for a writ of certiorari.  The Court denied the petition without reviewing the merits of this ground.  *See Brown v. Texas*, 522 U.S. 940 (1997) ("[T]he Court's action in denying certiorari does not constitute either a decision on the merits of the questions presented or an appraisal of their importance.") (internal citation omitted).

[5]  To the extent Troy challenges the constitutionality of Section 384.24(2), Florida Statutes, under the Florida constitution, his claim warrants no relief. See 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. at 67.  A facial challenge to the constitutionality of a state statute under a state constitution is a matter of state law that is not cognizable on federal habeas review.  *See Wainwright v. Goode*, 464 U.S. 78, 83-84, 104 S. Ct. 378, 78 L. Ed. 2d 187 (1983) ("It is axiomatic that federal courts may intervene in the state judicial process only to correct wrongs of a constitutional dimension." (citations omitted); *Jones v. Goodwin*, 982 F.2d 464, 471 (11th Cir.1993) (federal habeas review "is no occasion for considering the facial constitutionality of [a state] statute; such elective speculation is better left to the law reviews"); *Krasnow v. Navarro*, 909 F.2d 451, 452 (11th Cir.1990) ("A writ of habeas corpus is available in federal court only in cases of constitutional error.").
   Troy in several other grounds of his federal petition asserts error under the Florida Constitution.  Because none of Troy's state law arguments are cognizable in his federal petition, the court rejects the state law components of each ground without discussion.

as an evidentiary proscription rather than a redefinition of *mens rea.* Troy asserts that, while the United States Supreme Court upheld a similar statute in *Montana v. Egelhoff,* 518 U.S. 37, 116 S. Ct. 2013, 135 L. Ed. 2d 361 (1996), there are significant differences between the statute in that case and Florida's statute.  [FN6]

> FN6.  Troy filed a pretrial motion to declare section 775.051 unconstitutional as violative of the right to due process and another motion to declare the statute unconstitutional as violative of equal protection.  In the first motion, Troy alleged that he would proffer evidence establishing that he ingested numerous drugs on the night that the crimes occurred, and, since such evidence would be relevant to the question of premeditation, section 775.051 unconstitutionally precluded him from presenting this relevant evidence in his own defense.
>
> In the second motion alleging a denial of equal protection, Troy argued that the exception under the statute for lawfully prescribed drugs results in an equal protection violation because a person with a lawful prescription for a mood altering drug would be allowed to use voluntary intoxication as a defense, while a defendant who used the same drug *without* a prescription could not use the same defense.

Whether challenged statutes are constitutional is a question of law which the appellate court reviews *de novo*. *Caribbean Conservation Corp. v. Fla. Fish & Wildlife Conservation Comm'n,* 838 So. 2d 492, 500 (Fla.2003).  Section 775.051 provides as follows:

> **775.051. Voluntary intoxication; not a defense; evidence not admissible for certain purposes; exception.**  Voluntary intoxication resulting from the consumption, injection, or other use of alcohol or other controlled substance as described in chapter 893 is not a defense to any offense proscribed by law. Evidence of a defendant's voluntary intoxication is not admissible to show that the defendant lacked the specific intent to commit an offense and is not admissible to show that the defendant was insane at the time of the offense, except when the consumption, injection, or use of a controlled substance under chapter 893 was pursuant to a lawful prescription issued to the defendant by a practitioner as defined in s. 893.02.

14

§ 775.051, Fla. Stat. (2001).  Section 775.051 was enacted in 1999, several years after the United States Supreme Court rendered its decision in *Egelhoff*. *See* ch. 99-174, § 1, Laws of Fla.

In *Egelhoff,* the Court found that Montana's statute providing that "voluntary intoxication 'may not be taken into consideration in determining the existence of a mental state which is an element of [a criminal] offense,'" 518 U.S. at 39-40, 116 S. Ct. 2013, did not violate the due process clause. *Id.* at 56, 116 S. Ct. 2013.  Writing for a plurality, Justice Scalia noted that the common law did not allow for a defense of voluntary intoxication for specific intent crimes, and that the defense was created through judicially created exceptions to the common law rule. *Id.* at 45-46, 116 S. Ct. 2013.  Justice Scalia emphasized that states have traditionally been given wide latitude in regulating the methods by which its laws are executed, and that the federal courts will only intervene under the Due Process Clause if the state rule "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* at 43, 116 S. Ct. 2013 (quoting *Patterson v. New York,* 432 U.S. 197, 201-02, 97 S. Ct. 2319, 53 L. Ed. 2d 281 (1977)).  The opinion concluded that the defense did not constitute a fundamental principle of justice, and that nothing in the due process clause prevents "[t]he people of Montana [from deciding] to resurrect the rule of an earlier era, disallowing consideration of voluntary intoxication when a defendant's state of mind is at issue." *Id.* at 56, 116 S. Ct. 2013.  Thus, the defendant must establish that his "right to have a jury consider evidence of his voluntary intoxication in determining whether he possesses the requisite mental state is a 'fundamental principle of justice.'" *Id.* at 43, 116 S. Ct. 2013.

In Florida, two appellate decisions have addressed and upheld the constitutionality of section 775.051. *See Barrett v. State,* 862 So. 2d 44 (Fla. 2d DCA 2003); *Cuc v. State,* 834 So. 2d 378 (Fla. 4th DCA 2003).  In *Cuc,* the defendant alleged that she was denied her right to due process of law under section 775.051 because she was not allowed to raise a defense of voluntary intoxication. 834 So. 2d at 378.  In affirming her conviction, the Fourth District noted that the statute at issue in Florida was similar to the one upheld in *Egelhoff*. *Id.*  Thus, in affirming her conviction, the court concluded that "[a]s in *Egelhoff,* the people of the State of Florida have decided to resurrect the rule that intoxication is not a defense to specific intent crimes." *Id.* at 379 (citing § 755.051, Fla. Stat. (2000)).

In the case before the Second District, Barrett was convicted of first-degree murder; on appeal, he argued that section 775.051 "improperly excludes a

class of relevant evidence and lessens the State's burden to prove his guilt beyond a reasonable doubt." *Barrett,* 862 So. 2d at 45. Barrett conceded that the Florida statute was similar to the statute upheld in *Egelhoff,* but he argued that Florida's Constitution provides stronger due process protections than does the United States Constitution. *Id.* at 47, 116 S. Ct. 2013. The Second District disagreed, holding that "there is no basis to conclude that the Florida Constitution provides greater protections to Barrett than does the United States Constitution in relation to the elimination of voluntary intoxication as a defense to a criminal offense." *Id.* at 48, 116 S. Ct. 2013.

The *Barrett* court also considered whether section 775.051 effects a "substantive change to the mens rea element of criminal conduct or is simply a rule of evidence." *Id.* at 48. The court found that, based on this Court's precedent in *State v. Garcia,* 229 So. 2d 236, 238 (Fla.1969), and *Caple v. Tuttle's Design-Build, Inc.,* 753 So. 2d 49, 53 (Fla.2000), the change is substantive, in line with *Egelhoff:*

> Substantively, section 775.051 addresses the *mens rea* element of criminal offenses by stating that voluntary intoxication is not a defense to criminal conduct and cannot be used to show that the defendant lacked the specific intent to commit a crime. This is consistent with the State's interest in making persons who voluntarily become intoxicated responsible for their behavior. *See Egelhoff,* 518 U.S. at 49-50. However, the statute also addresses procedural matters by excluding, at trial, evidence of voluntary intoxication.

> Although section 775.051 has both substantive and procedural elements, this does not render the statute constitutionally infirm when the procedural provisions "are intimately related to the definition of those substantive rights." *See Caple,* 753 So. 2d at 54. As was the case with the Montana statute under Justice Ginsburg's analysis, section 775.051 effects a substantive change in the definition of mens rea, and it is not simply an evidentiary rule. *See Egelhoff,* 518 U.S. at 57-60.

*Barrett,* 862 So. 2d at 48 (parallel citations omitted). We find the reasoning and conclusions in *Cuc* and *Barrett* to be sound and we adopt that reasoning as our own.

Troy further asserts that section 775.051 violates equal protection principles and creates an unconstitutional distinction based on whether or not the charged individual was using an intoxicating substance in accordance with a lawful prescription.  In *Duncan v. Moore,* 754 So. 2d 708 (Fla. 2000), we held:

> Equal protection is not violated merely because some persons are treated differently than other persons.  It only requires that persons similarly situated be treated similarly.  In the absence of a fundamental right or a protected class, equal protection demands only that a distinction which results in unequal treatment bear some rational relationship to a legitimate state purpose.  This is known as the rational basis test.  Since there is no fundamental right or suspect class at issue here, the State need only meet that test.

*Id.* at 712 (citations omitted).  In applying the rational basis test, the courts first look to whether the statute serves a legitimate government purpose, and second, whether the legislature was reasonable in its belief that the classification would promote that purpose.  *Hechtman v. Nations Title Ins. of New York,* 840 So. 2d 993, 996 (Fla.2003).

Both prongs are easily satisfied in this instance.  The exception in the statute protecting prescription drug users is derived from the Fourth District's decision in *Brancaccio v. State,* 698 So. 2d 597 (Fla. 4th DCA 1997); in that decision, the court rationalized as follows:

> Because a patient is entitled to assume that an intoxicating dose would not be prescribed or administered by a physician, where intoxication results from medicine which has been prescribed (and taken as prescribed) or administered by a physician, such intoxication is generally considered involuntary.

698 So. 2d at 599 (quoting Phillip E. Hassman, Annotation, *When Intoxication Deemed Involuntary so as to Constitute a Defense to Criminal Charge,* 73 A.L.R.3d 195 (1976)).  We find it reasonable for the Legislature to conclude that penal accountability should not attach to the lawful use of prescribed drugs where an unfortunate reaction has occurred, and we reject both Troy's due process challenge and his equal protection challenge to section 775.051.

*Troy v. State*, 948 So. 2d at 643-45 (emphasis in original).

17

Because the state court correctly recognized that *Montana v. Egelhoff*, 518 U.S. 37, 51 (1996), governs this ground for relief, Troy cannot meet the "contrary to" test in Section 2254(d)(1).  Instead he must show that the state court unreasonably applied *Egelhoff* or unreasonably determined the facts.  Troy does neither.  In sum, Troy fails to meet his burden of proving that the state court unreasonably applied controlling Supreme Court precedent or unreasonably determined the facts in rejecting this ground on direct appeal.  *See* 28 U.S.C. § 2254(d)(1), (2).

**Ground Two**

Troy was convicted of the attempted sexual battery of Bonnie Carroll.  He contends that the circumstantial evidence presented at trial was legally insufficient to sustain this conviction.  Specifically, he argues that the state trial court erred (1) by denying his motion for judgment of acquittal on this charge, (2) by finding that the attempted sexual battery was an aggravating factor, and (3) by mischaracterizing the associate medical examiner's testimony in both the ruling on the motion for judgment of acquittal and the sentencing order.  Troy claims both that the associate medical examiner, Dr. Hunter, testified only that the circumstances of the crime scene were consistent with an attempted sexual battery and that the state trial court judge, in denying the motion for judgment of acquittal, mischaracterized Dr. Hunter's testimony by concluding that Dr. Hunter had "reached a conclusion medically that there was an attempted sexual battery."  (Doc. 1, p. 12).

Troy concedes that the prosecution proved that the circumstances of the crime were consistent with an attempted sexual battery.  He argues however, that the real issue is

18

"whether the [S]tate proved that the circumstances were inconsistent with a reasonable hypothesis that [he], in committing this homicide, did so without attempting to commit a sexual battery on Ms. Carroll." (Doc. 1, p. 13). Troy asserts that the state trial court judge's mischaracterization of Dr. Hunter's testimony "compounded and perhaps caused" the erroneous denial of his motion for judgment of acquittal and the improper inclusion of the attempted sexual battery as an aggravating factor at sentencing.

The Florida Supreme Court rejected this ground on direct appeal:

Troy next argues that the State failed to present evidence inconsistent with the reasonable hypothesis that no attempted sexual battery occurred, and thus that the circumstantial evidence is legally insufficient to prove the charge of attempted sexual battery.

In *Johnston v. State*, 863 So. 2d 271 (Fla. 2003), this Court explained the applicable law governing sufficiency of circumstantial evidence in upholding convictions:

In reviewing a motion for judgment of acquittal, a *de novo* standard of review applies. *See Pagan v. State*, 830 So. 2d 792, 803 (Fla. 2002), *cert. denied*, 539 U.S. 919 (2003).

Generally, an appellate court will not reverse a conviction that is supported by competent, substantial evidence. *See Pagan*, 830 So. 2d at 803 (citing *Donaldson v. State*, 722 So. 2d 177 (Fla. 1998); *Terry v. State*, 668 So. 2d 954, 964 (Fla. 1996)). There is sufficient evidence to sustain a conviction if, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt. *See Banks v. State*, 732 So. 2d 1065 (Fla. 1999). "A motion for judgment of acquittal should be granted in a circumstantial evidence case if the state fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt." *Orme v. State*, 677 So. 2d 258, 262 (Fla. 1996).

"The question of whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine, and where there is

substantial, competent evidence to support the jury verdict, we will not reverse." *Darling v. State*, 808 So. 2d 145, 155 (Fla.) (quoting *State v. Law*, 559 So. 2d 187, 188 (Fla. 1989)), *cert. denied*, 537 U.S. 848 (2002).  In meeting its burden, the State is not required to "rebut conclusively, every possible variation of events" which could be inferred from the evidence, but must introduce competent evidence which is inconsistent with the defendant's theory of events.  *Darling*, 808 So. 2d at 156 (quoting *Law*, 559 So. 2d at 189).  Once the State meets this threshold burden, it becomes the jury's duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt.  *Id.*

. . . .

This Court does not have to determine that every reasonable hypothesis of innocence was excluded in this case.  The sole determination we must make is whether there was competent, substantial evidence for the jury to make such a determination.  *See Darling*, 808 So. 2d at 156 (citing *Law*, 559 So. 2d at 188-89).  *Johnston*, 863 So. 2d at 283-84 (parallel citations omitted).

Troy contends that the circumstantial evidence produced by the prosecution just as easily establishes that he attacked Carroll in a frenzied rage, resulting in the torn clothing and the minor bruising on the thigh areas.  Thus, he argues, this is a reasonable hypothesis of innocence to the charge of attempted sexual battery that the State has failed to exclude.  The State counters that there is both direct evidence establishing Troy's presence at the scene of the attempted sexual battery and an overwhelming wealth of circumstantial evidence establishing that an attempted sexual battery occurred.

First, we agree with Troy in his assertion that the trial judge misconstrued the medical examiner's findings when denying the defendant's motion for judgment of acquittal on the sexual battery charge, both as an independent charge and as a basis for felony murder.

While the trial court stated that the medical examiner had rendered a definitive opinion on attempted sexual battery, a thorough review of the medical examiner's testimony reveals only his statement that Carroll's injuries were consistent with an attempted sexual battery, but were not conclusive. [FN7]

> FN7.  The following exchanges took place on direct examination of Dr. Michael Hunter, the medical examiner who examined Carroll's body:

20

Q.     What other pieces of evidence or other things did you find that were consistent with a sexual battery having been attempted or completed?

A.     Well, you know, once again, we don't work in a closed box of just having the victim at the autopsy.   At the scene, this is an individual who is nude.   This is an individual who we see evidence that she has some ligature which is present about one of her wrists, and "ligature" means that something has been present and tied and something restraining her wrist that leaves a particular pattern that I'm able to identify and interpret.

So I think all these changes, the fact that she's nude, she has evidence that she's been bound, she has injury, very minor injury but injury nevertheless on the external genitalia, and she had injuries of the legs, very small minor-type injuries, but I think those are all factors that I take in account in a case like this, saying, you know, those would be consistent with sexual assault.

. . . .

Q.     In this particular case, given all the factors that you've talked about regarding the victim, the way she was found, the injuries that you found, in your medical opinion, are all these factors consistent with someone attempting to sexually batter this victim before she was killed?

A.     I think it's consistent, yes.

During cross examination, Dr. Hunter confirmed that he did not consult with a gynecological expert in the case. The following exchange also took place:

Q.     Isn't it true that hyperemias can be the result of certain gynecological conditions?

A.     Yes.

21

Q.   The areas of hyperemia that you observed, they were not abrasions or contusions, correct?

A.   Right.

Q.   They could have been from friction?

A.   Yes.

Q.   If there, in fact, was a tussle between Ms. Carroll and her attacker, these areas could be the result of the tussle?

A.   Sure, yes.

Q.   You are not telling the jury that what you observed, in fact, had to be a penetration injury from sexual assault?

A.   Yeah, no, I'm not.

However, this Court has held that "[i]f there is room for a difference of opinion between reasonable people as to the proof or facts from which an ultimate fact is to be established, or where there is room for such differences on the inferences to be drawn from conceded facts, the court should submit the case to the jury." *Barwick v. State*, 660 So. 2d 685, 695 (Fla. 1995) (quoting *Taylor v. State*, 583 So. 2d 323, 328 (Fla. 1991)).  Among the indicia of an attempted sexual battery produced at trial is the evidence that the victim was found completely nude, with her underwear and torn bra next to her body, and that she exhibited bruises in the exterior of her vaginal area.  When coupled with the extensive evidence presented of the gruesome nature of the crime scene reflecting a great deal of violence inflicted upon the victim, we conclude that the trial court was correct in submitting this charge to the jury, despite the trial court's mischaracterization of the medical examiner's testimony.  Importantly, despite the trial judge's overstatement of the conclusive nature of the medical examiner's testimony, this expert nevertheless found that Ms. Carroll's injuries could support the conclusion that an attempted sexual battery occurred.

*Troy v. State*, 948 So. 2d at 645-47.

Troy in his federal petition asserts no federal constitutional claim in ground two.  To

the extent that Troy may seek to support his federal petition by relying upon the same state

law arguments challenging the sufficiency of the evidence that he presented on direct appeal, he cannot obtain relief because violations of state law provide no basis for federal habeas relief. 28 U.S.C. § 2254(a). *See also Wainwright v. Goode*, 464 U.S. at 83-84; *Jones v. Goodwin*, 982 F.2d at 471; *Krasnow v. Navarro*, 909 F.2d at 452. To the extent that this ground, liberally construed, asserts a federal due process violation based upon the insufficiency of the evidence, the ground is unexhausted because Troy presented no federal due process claim to the state courts. *See Pearson v. Sec'y, Dep't of Corr.*, 273 Fed. App'x 847, 850 (11th Cir. 2008) (holding that petitioner failed to exhaust his federal due process claim, because petitioner's direct appeal did not alert the state court to the federal nature of his insufficient evidence claim; in state court petitioner cited exclusively to state cases and all of his substantive arguments addressed Florida law); *Cook v. McNeill*, 266 Fed. App'x 843, 845-46 (11th Cir. 2008) (same). Notwithstanding this procedural hurdle, the ground lacks substantive merit.

      1.    Denial of motion for judgment of acquittal

In evaluating a sufficiency of the evidence claim, Florida courts assess whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt. *Simmons v. State*, 934 So.2d 1100, 1111 (Fla. 2006); *Lynch v. State*, 293 So.2d 44 (Fla. 1974). This standard is the same as the federal standard for evaluating a due process challenge based on the sufficiency of the evidence. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) ("[T]he relevant question is whether, after viewing the evidence in the light most favorable to the

23

prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.") (emphasis in original).

The Due Process Clause of the Fourteenth Amendment prohibits a criminal conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime." *In re Winship*, 397 U.S. 358, 364 (1970). In a challenge to a state criminal conviction brought pursuant to Section 2254, a petitioner is entitled to habeas relief on a claim of insufficient evidence "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. at 324. "[T]his inquiry does not require a court to 'ask itself whether *it* believes that the evidence at trial established guilt beyond a reasonable doubt.'" *Jackson*, at 318-19 (quoting *Woodby v. INS*, 385 U.S. 276, 282 (1966) (emphasis in original)).

Sufficiency of the evidence claims are governed by the substantive elements of a criminal offense as defined by state law. *Jackson,* at n.16. "Although each element of the offense must be established beyond a reasonable doubt, *see Bishop v. Kelso*, 914 F.2d 1468, 1470 (11th Cir. 1990) (citing *Jackson*, 443 U.S. at 316), the State is not required to rule out every hypothesis except that of the guilt of the defendant, *see Jackson*, 443 U.S. at 326)." *Johnson v. Alabama*, 256 F.3d 1156, 1172 (11th Cir. 2001). If the record contains facts supporting conflicting inferences, the jury is presumed to have resolved those conflicts in favor of the State and against the defendant. In other words, federal courts must defer to the judgment of the jury in assigning credibility to the witnesses and weighing the evidence. *Johnson*, 256 F.3d at 1172 (citing *Jackson*, 443 U.S. at 326). The *Jackson* standard applies

whether the evidence is direct or circumstantial.  *United States v. Peddle*, 821 F.2d 1521, 1525 (11th Cir. 1987) (citing *Holland v. United States*, 348 U.S. 121 (1954)).

Florida law provides that a motion for judgment of acquittal will be granted "[i]f, at the close of the evidence for the state or at the close of all the evidence in the case, the court is of the opinion that the evidence is insufficient to warrant a conviction."  Fla. R. Crim. P. 3.380(a).  The prosecution presented circumstantial evidence through the medical examiner's testimony to establish an inconsistency between the evidence and the defense's theory of the case.  The evidence created a question of fact for the jury to resolve as to Troy's guilt on the attempted sexual battery charge.  *See Hampton v. State*, 680 So. 2d 581, 584 (Fla. 3d DCA 1996); *Orme v. State*, 677 So. 2d 258, 262 (Fla. 1996).  "The credibility and probative force of conflicting testimony should not be determined on a motion for judgment of acquittal." *Lynch v. State*, 293 So. 2d 44, 45 (Fla. 1974).

Dr. Michael Hunter, a medical examiner, performed an autopsy on Bonnie Carroll. He testified on direct examination at trial that Carroll had injuries to her inner thighs and vaginal area consistent with attempted sexual assault:

> Q:    I would like to move, if we could, to any evidence that you found.  I know you talked about doing a sexual assault kit and you are specifically looking to see if there's a possibility of a sexual battery in this case.  Did you find any evidence or injuries that suggested that a sexual battery had either occurred or had been attempted?
>
> A:    There were very small injuries on the external genitalia and I have that documented both in the report and in my diagrams.  There are very small areas of just vascular dilation; it's discoloration which resulted in these blood vessels somewhat dialating.  They are very small and there

aren't internal injuries associated with this.  There are also, once again, small, faint bruising on both thighs.  And - -

Q:     Let me back up for a minute.  I would just like to speak about the injuries to her vaginal area.  You say they are on the outside of her vaginal opening?

A:     Yes.

Q:     And how many injuries did you see in that area?

A:     I believe there were two.  Can I - -

Q:     Sure.

A:      - - refer?  Yes, there were two that I documented here.

Q:     Are you able to tell us whether these injuries are fresh, in other words, occurring around and/or at the time that her injuries you are about to describe occurred?

A:     Yes, they would be relatively fresh injuries.

. . . .

Q:     I'll stay with the vascular prominence.  Are those injuries consistent with a forceful act such as a perpetrator's penis or fingers coming into contact with the victim's vaginal area?

A:     Yes.

Q:     Were there other factors?  I know you mentioned the bruising to the leg area.  Tell us a little bit about that.  Where did you seen those and what was your opinion regarding those injuries?

A:     She has, you know, once again, very small areas of contusion, bruises on the medial aspect or on the inner aspect of the thighs above the knees.

Q:     Now, would small contusion injuries be consistent with fingertips?

26

A:     It could be, yes.

Q:     So that if someone were forcefully holding her legs, would those contusions be consistent with what you found?

A:     Yes.

Q:     What other pieces of evidence or other things did you find that were consistent with a sexual battery having been attempted or completed?

A:     Well, you know, once again, we don't work in a closed box of just having the victim at the autopsy.  At the scene, this is an individual who is nude.  This is an individual who we see evidence that has some ligature which is present about one of her wrists and "ligature" means that something has been present and tied and something restraining her wrist that leaves a particular pattern that I'm able to identify and interpret.

So I think all these changes, the fact that she's nude, she has evidence that she's been bound, she has injury, very minor injury but injury nevertheless, on the external genitalia, and she has injuries of the legs, very small minor-type injuries, but I think those are all factors that I take in account in a case like this, saying, you know, those would be consistent with sexual assault.

Q:     Doctor, I'm going to give you some additional factors and ask you about those.  If you were to learn that the clothing that was worn by the victim had been cut off of her and was in close proximity to her bed, having been cut with a knife, would that also be factor, in your opinion, as to whether a sexual battery had been attempted or completed in this case?

A:     Yes.

Q:     What about if you were to learn that her underwear was in close proximity to her body and inside out, as if it was pulled off of her, would that be a factor in your opinion?

A:     Yes.

Q:     What about a bra being out or near her body at the time that it was found; would that be a factor in your opinion?

A:     You know, once again, if it had been forcefully removed, such as, you know, being cut, I would say yes; otherwise, just the fact it's present in that location really doesn't, you know, make a lot of difference to me.

Q:     Okay.  In this particular case, you mention you went on to so some testing regarding whether there was the presence of semen?

A:     Yes.

Q:     Do you know whether - - do you know the results of those tests, whether there was the presence of semen?

A:     We do cytologic testing; meaning we'll take smears of these different areas, the vagina, the anus, and we'll make smears or slides that we can look at under the microscope.  Now, in the interpretation of those slides, there was no sperm that was identified.  But also, the swabs were also submitted with law enforcement, so I don't know what the result of that testing was.

. . . .

Q:     Let me ask you this, if there is no presence of semen in this particular case, does that automatically mean that a sexual battery wasn't attempted or didn't occur?

A:     No.

Q:     Have you had cases where a sexual battery occurred but there is no presence of semen?

A:     Yeah.  In cases in which my opinion was that there was a sexual assault or sexual battery, yes.

Q:     So that's not an uncommon occurrence?

A:     No.

28

Q:   In this particular case, given all the factors that you've talked about regarding the victim, the way she was found, the injuries that you found, in your medical opinion, are all these factors consistent with someone attempting to sexually batter this victim before she was killed?

A:   I think it's consistent, yes.

(Doc. 17, Ex. A20, pp. 1360-66).

Dr. Hunter testified on cross-examination that Carroll's genital injuries could have resulted from a physical struggle:

Q:   Would it be fair to say that as you examined the exterior surface of the body, you did not discover any dried semen or anything that appeared to be dried semen?

A:   Yes, that's true.

Q:   And when you examined the sexual organs, that would have begun with an examination of the pubic hair, correct?

A:   Yes.

Q:   And would it be fair to say that you found no dried semen in the pubic hair?

A:   That's correct.

Q:   With respect to the injuries that you noted to the sexual organs, would it be fair to say that you can't even be a hundred percent confident that these are, in fact, injuries?

A:   I think they are injuries.  I think that I'm confident saying that, at a minimum, they're an injury.  The degree of injury, I think, is, to me, questionable.

Q:   Do you have any specific gynecological training?

A:   I do, but it's somewhat limited.

Q:     Did you consult with any gynecological expert in the case?

A:     No.

Q:     Isn't it true that hyperemia can be the result of certain gynecological conditions?

A:     Yes.

Q:     The areas of hyperemia that you observed, they were not abrasions or contusions, correct?

A:     Right.

Q:     They could have been from friction?

A:     Yes.

Q:     If there, in fact, was a tussle between Ms. Carroll and her attacker, these areas could be the result of the tussle?

A:     Sure, yes.

Q:     You are not telling the jury that what you observed, in fact, had to be a penetration injury from sexual assault?

A:     Yeah, no, I'm not.

Q:     And as you mentioned twice, but just so that we're clear, you carefully examined the interior of the vagina as well?

A:     Right.

Q:     And found no injuries?

A:     Right.

Q:     And the small contusions that you found in the thigh area could also have been the result of a tussle?

A;     Sure, yes.

30

(Doc. 17, Ex. A20, pp. 1462-65).

Finally, Dr. Hunter reiterated on re-direct examination his opinion that the evidence was consistent with a sexual assault:

Q:   Doctor, I'd just like to return to the injuries that you found in the genital area of the victim and ask you - - you were asked the question whether they could occur in a tussle.  Would you expect injuries to that particular area to occur as a result of a tussle?

A:   Well, I wouldn't expect them to occur from, you know, an assault, but you can have an injury, a blow maybe to that area, but it wouldn't be a typical injury you would expect to see.

Q:   If you have the other additional factors that you have in this case, with the - - I think you've described them, the victim found nude, the fact that her clothes were cut off, underwear near her body, the ligatures, the bruises on her thighs, does all of that help you or aid you in coming to the conclusion that the injuries are consistent with an attempted sexual battery?

A:   Yes, all that is helpful in coming to a conclusion such as that.

Q:   Can you look at one injury in isolation, or do you have to look at how it related to all of the other factors in the case?

A:   I think, like I said earlier, the scene is important, what you see there, the condition of the victim, what I'm identifying through an examination, all those are factors you take into account to come to, you know, some degree of conclusion.

(Doc. 17, Ex. A20, pp. 1466-67).

After the prosecution rested, Troy moved for a judgment of acquittal of the attempted sexual battery charge.  The state trial court judge denied the motion:

On the question of the attempted sexual battery, it is true there's no evidence of semen or actual penetration, but when you summarize the facts as observed by the medical examiner, who I have to point out had reached a conclusion

31

medically that there was an attempted sexual battery based upon his experience and training and his observation of the evidence as he knew it from a forensic standpoint as a pathologist, no single one of these facts were conclusive, but together they form the pattern that helped support the medical examiner's opinion. These include the fact that a dress was cut off of the victim. She was found nude in the bedroom. She had ligature marks consistent with being bound around her wrists. She had small injuries to her genitalia which were consistent with digital [or] penile penetration. Although there are other innocent explanations for those that could have occurred naturally, again, you have to put this in the whole picture of the mosaic. There were also injuries to the eyes consistent with strangulation; although, of course, those injuries could have occurred otherwise, as the medical examiner indicated. Those are all indications that it was a necessity to subdue the victim. There were small bruises above the knees consistent with manual manipulation of her legs, which would be necessary to obtain access for intimate sexual contact. The bed was disheveled. Her panties were found turned inside out near the body. Of course, the bra was removed.

There was a cloth gag found stuffed in her throat. I think the medical examiner also indicated that she was on her back when a lot of the stabbing occurred; which would be consistent with subduing a resisting victim who was trying to defend herself against a sexual attack.

Then, of course, the defendant admitted to Marilyn Brooks that he had tied up Bonnie Carroll. Of course, he denied that there was any sexual motive, which is probably something one might expect from someone talking to their girlfriend about the situation. But the defendant's explanation through other witnesses that he had to shut her up because they had a dispute triggered by a comment that Bonnie Carroll made about Marilyn Brooks is difficult to understand why the victim, then, would have to be nude in order to subdue her and make her be quiet. I mean, the inference is that there must have been some sexual interest on the part of the defendant given the nature of the injuries. And everything totaled together, it makes sense that the jury might be able to conclude that there was a sexual motive behind the attack here.

So, again, I don't know how the jury would read all these facts. They certainly could conclude, as the defendant has asked or probably will ask, that the act, the death occurred spontaneously and without the premeditated elements the State alleges, but certainly it's certainly a dispute that's legitimate for a jury to consider.

So for all those reasons and because of the facts that I reviewed [in] support [of] the State's charges, I'm denying the motion for judgment of acquittal.

(Doc. 17, Ex. A25, pp. 2038-40).

Viewing the testimony adduced at trial and the balance of the evidence of Troy's guilt in the light most favorable to the prosecution and using the objective reasonableness test, a rational trier of fact could find Troy guilty of the attempted sexual battery of Bonnie Carroll. Consequently, Troy fails to show that the state trial court erred in denying his motion for judgment of acquittal and fails to show a due process violation based upon insufficient evidence. *See Jackson*, 443 U.S. at 319; *Simmons*, 934 So. 2d at 1111.

2.      Attempted sexual battery as an aggravating factor

The state trial court judge in his sentencing order considered the attempted sexual battery as an aggravating factor assigned considerable weight.[6]  In the order the state trial court judge erroneously states that "it was the medical examiner's opinion that [Bonnie Carroll] had experienced an attempted sexual battery before she was killed." (Doc. 17, Ex. A10, p. 13).  As described above, although such statement mischaracterizes the medical examiner's testimony, sufficient evidence exists to support the attempted sexual battery conviction.  Notwithstanding this error, the sentencing order shows that this particular

---

[6] Troy refers to the following aggravating factor:

D.      THE CAPITAL FELONY WAS COMMITTED WHILE THE DEFENDANT WAS ENGAGED . . . IN THE COMMISSION OF, OR AN ATTEMPT TO COMMIT, OR FLIGHT AFTER COMMITTING OR ATTEMPTING TO COMMIT, . . . ROBBERY; SEXUAL BATTERY.

(Doc. 17, Ex. A10, p. 12).

aggravating factor was premised upon both the robbery and the attempted sexual battery of Bonnie Carroll.[7]  (Doc. 17, Ex. A10, sentencing order, pp. 12-13).  Even extracting the attempted sexual battery, the robbery remains a valid basis for application of this aggravating factor.[8]  Consequently, no adverse consequence inures from the state trial court judge's mischaracterization of the medical examiner's testimony on the attempted sexual battery.

      3.    <u>Mischaracterization of testimony</u>

To the extent that Troy presents as an independent basis for relief a claim that the state trial court judge erred by mischaracterizing the medical examiner's testimony in both the ruling on the motion for judgment of acquittal and the sentencing order, such claim provides no basis for relief because it states no federal constitutional claim.  Troy presents no evidence or legal authority to the contrary.

The Florida Supreme Court's rejection of ground two was neither an unreasonable application of controlling Supreme Court precedent or an unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d).

## II.   PENALTY PHASE CLAIMS

## Ground Three

Trial counsel moved before trial to suppress Troy's post-arrest confession.  The confession included a detailed account of Bonnie Carroll's murder and a statement that Troy

---

      [7] Troy presented this sub-claim to the Florida Supreme Court in his direct appeal brief but the court did not address the claim as a separate substantive claim of trial court error in the order affirming Troy's convictions and death sentence.

      [8] Troy does not appear to challenge the sufficiency of the evidence to support the robbery conviction.

cut Carroll's throat to ensure her elimination as a witness.  (Doc. 17, Ex. A36, pp. 3509-14).

The state trial court judge granted the motion and stated that the confession could only be

used for impeachment purposes if Troy testified at any hearing in the case.  (Doc. 17, Ex. A2,

pp. 228-31).  Trial counsel also moved before trial to enforce Troy's right of allocution and

sought permission for Troy to express his remorse to the jury during the penalty phase

without being subject to cross-examination.   (Doc. 17, Ex. A3, pp. 504-05).  The state trial

court judge denied the motion.  (Doc. 17, Exs. A19, pp. 1168-77).  Trial counsel revisited this

issue during the penalty phase but, because the state trial court judge ruled that Troy would

be subject to cross-examination if he elected to testify in front of the jury and because a

possibility existed that the prosecutor would then introduce the balance of Troy's confession

in which he discussed cutting Carroll's throat to eliminate her as a witness, Troy forewent

taking the stand.  (Doc. 17, Exs. A26, pp. 2285, A34, pp. 3267-69).

   After the jury rendered its advisory sentence of death, the state trial court judge

conducted a *Spencer*[9] hearing at which trial counsel called Detective Gregory Grodoski to

testify to limited statements in Troy's previously suppressed confession to the police.  The

prosecutor objected to this testimony but the state trial court judge overruled the objection.[10]

---

[9] *See Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

[10] The prosecutor challenged the testimony on hearsay grounds and argued that Grodoski's testimony
would "open the door" for the State to introduce the remainder of the confession:

[Counsel]:     At any time did Mr. Troy deny that he was responsible for causing the death
               of Bonnie Carroll?

[Prosecutor]:  Objection.  Your Honor, I have two objections.  First of all, the question is

                                                                              (continued...)

(Doc. 17, Ex. A36, pp. 3502-04).  Grodoski testified that Troy in his confession did not deny responsibility for Carroll's murder and that Troy expressed remorse.  (Doc. 17, Ex. A36, pp. 3504-05).

On cross-examination the prosecutor inquired about other portions of the confession and trial counsel objected.  (Doc. 17, Ex A36, pp. 3505-07).  The state trial court judge concluded that "whether or not [Troy] was remorseful for his actions certainly . . . opens the door for a substantive response by the State as to what the content of the alleged confession was."  (Doc. 17, Ex. A36, p. 3507).  Grodoski proceeded to testify about Troy's admissions of tying Carroll up with an extension cord, the victim's attempts to defend herself against

---

[10](...continued)

> calling for a hearsay answer and I do not believe that there is any exception to the hearsay rule with regard to the response that Detective Grodoski would give.  I do have the case of *Griffith v. State*, which is a Supreme Court case, cited July 7th, 1994, which talks about hearsay statements specifically with regard to issues of remorse which is what I believe the defense is trying to get to in this case.  So my first objection would be that this is a hearsay statement.

> Secondly, Judge, as the court recalls, this statement by the defendant was suppressed by a court order pursuant to the defendant's own motion to suppress.  Now the defense is asking to elicit statements from the statement given by his client that would be helpful for him in his case specifically with regard to the non-statutory mitigator of remorse and I believe that is where the defense is going with this.  And my position on that, Judge, is if the defense is allowed to go into this statement to pull out a non-statutory mitigator, the State feels that would then open the door for the State to be allowed to get into the statement because there is a statutory aggravator of elimination of a witness that is contained within the statement given by the defendant.

> So two objections.  First, it shouldn't be allowed at all based on the hearsay rule; and secondly, if it is allowed, then it does open the door for the State to be able to get into the statement as well.

(Doc. 17, Ex. A36, pp. 3502-03).

Troy, Troy repeatedly stabbing Carroll when he realized she was not yet dead, and Troy's statements that he decided he had to "eliminate" Carroll so that she could not be a witness against him. (Doc. 17, Ex. A36, pp. 3509-14). At the conclusion of the *Spencer* hearing before the state trial court judge pronounced sentence, Troy ultimately made a statement to both the court and victim Traci Burchette expressing his remorse.

Troy now contends in his federal petition that he was denied a fair penalty hearing and due process because the state trial court (1) denied him his right to allocution to express his remorse to the jury, (2) impermissibly chilled his right to testify about his remorse "by refusing to rule that this would not 'open the door' for the State to introduce, before the jury, the details of the crime (including a new aggravator of witness elimination) from an unconstitutionally obtained confession," and (3) allowed the State to introduce at the *Spencer* hearing the previously suppressed confession. (Doc. 1, p. 15).

The Florida Supreme Court rejected this ground on direct appeal:

Troy's third argument asserts that he was denied due process of the law when (1) he was prevented from exercising his right of allocution directly before the jury during his sentencing phase, and (2) the threat of cross-examination put Troy in a position where he could not risk exercising his constitutional right to testify or introduce other evidence regarding statements of remorse he made to law enforcement officers.

### a. Right of Allocution

Prior to trial, Troy filed a motion to enforce his right to allocute in front of the jury, based on both constitutional and common-law principles allowing a defendant to stand before the sentencing authority and present an unsworn statement in mitigation. Defense counsel relied heavily on *State v. Zola*, 112 N.J. 384, 548 A.2d 1022 (1988), a New Jersey Supreme Court decision providing for a capital defendant's right to make an unsworn statement in

mitigation at the close of the penalty phase.  However, as the State pointed out during the hearing on the motion, New Jersey is not an advisory state, and the jury actually undertakes sentencing in capital cases.  The State also noted that in Florida, capital defendants have sufficient opportunity to allocute before the judge at a *Spencer* hearing.  Finally, the State asserted that, should Troy make a statement to the jury, it would be essential to have the opportunity to cross-examine him regarding his suppressed confession, wherein Troy admitted to "slicing Bonnie Carroll's throat specifically to eliminate her as a witness," which obviously could be used as an aggravator.  The trial court denied Troy's motion.  Troy subsequently filed a mitigation proffer, in which he expressed his intent to address the jury to express his feelings of shame and remorse, but felt he was unable to do so without "opening the door" to allow cross-examination on his inadmissible confession.

We find no error in the trial court's order denying Troy the right to make a statement to the jury without the State having the right to cross-examine Troy.  We also note that Troy did exercise his right to allocution before the trial court at his *Spencer* hearing.  *Spencer* outlines the proper sentencing phase procedure to be followed in death cases; it also emphasizes the role of the circuit judge over the trial jury in the decision to impose a sentence of death:

> First, the trial judge should hold a hearing to: a) give the defendant, his counsel, and the State, an opportunity to be heard; b) afford, if appropriate, both the State and the defendant an opportunity to present additional evidence; c) allow both sides to comment on or rebut information in any presentence or medical report; and d) *afford the defendant an opportunity to be heard in person*.  Second, after hearing the evidence and argument, the trial judge should then recess the proceeding to consider the appropriate sentence.  If the judge determines that the death sentence should be imposed, then, in accordance with section 921.141, Florida Statutes (1983), the judge must set forth in writing the reasons for imposing the death sentence.  Third, the trial judge should set a hearing to impose the sentence and contemporaneously file the sentencing order.  Such a process was clearly not followed during these proceedings.

> *It is the circuit judge who has the principal responsibility for determining whether a death sentence should be imposed*.  Capital proceedings are sensitive and emotional proceedings in which the trial judge plays an extremely critical role.

615 So. 2d at 690-91 (emphasis added).  It is clear that this course of action was followed in the instant case, with Troy exercising his right to be heard in person before the judge prior to the imposition of the death penalty.

In *Johnson v. State*, 608 So. 2d 4 (Fla. 1992), this Court rejected the defendant's claim that a videotape he made expressing remorse should have been shown to the jury.  *Id.* at 10.  At trial, the trial judge denied this request, agreeing with the prosecution that it would enable the defendant to escape cross-examination by not testifying in person.  *Id.*  This Court agreed with the trial court's decision to exclude the videotape, concluding,

> "All witnesses are subject to cross-examination for the purpose of discrediting them by showing bias, prejudice or interest."  *Jones v. State*, 385 So. 2d 132, 133 (Fla. 4th DCA 1980). Johnson could have made this plea to the judge, the sentencer, and we find no error in refusing to let the jury hear his self-serving statement.

*Johnson*, 608 So. 2d at 10.  We reaffirm our holding in *Johnson* here.

b. Troy's Ability to Testify and Introduce Evidence Regarding His Remorse

Prior to trial, the court determined that Troy's confession was acquired in violation of his right to counsel and would therefore only be admissible for purposes of impeachment.  Troy argues that the prosecutor repeatedly made it clear every time he tried to introduce testimonial evidence of his remorse to the jury (either through his own testimony or through the testimony of Detective Gr[o]doski), that she would, if permitted, seek to inquire about the suppressed confession, including statements therein possibly establishing the aggravator of witness elimination.  The judge, in turn, repeatedly agreed that he saw no reason why the "door would not be open" regarding relevant information in the confession, and therefore Troy should proceed at his own risk.  Thus, Troy asserts that the resulting constitutional Hobson's choice between his rights to testify and present evidence of the mitigating circumstance of remorse to the jury on the one hand, and his right not to be sentenced to death on the basis of a confession obtained in violation of his right to counsel on the other, deprived him of due process and a fair penalty hearing.

The record makes clear that any attempt on Troy's behalf to introduce evidence to the jury of his remorse could rightfully have been subject to a response by

the State on credibility grounds.  First, Detective Gr[o]doski testified at the *Spencer* hearing that although Troy expressed his remorse for killing Carroll, he was calm and collected during his confession, coolly recounting the events from the night of the crimes.  Furthermore, had Troy taken the stand himself, the State could have demonstrated that his statements to Gr[o]doski contradicted those to his mother and his girlfriend, which were admitted during the guilt phase of the trial.  Troy told both his girlfriend and his mother that Carroll "came onto" him and that he was not interested in having sexual relations with her; however, as came out during the *Spencer* hearing, Troy told Detective Gr[o]doski that the two were planning to have sex.  Troy also told his mother and girlfriend that he could not remember the episode with Carroll and that he blacked out; however, Troy was able to give Detective Gr[o]doski a detailed description of the night's events and specific details of Carroll's murder.

As we noted in *Johnson*, if Troy desired to demonstrate his remorse to the jury and to make clear that he accepted responsibility for his actions, the fact-finder should be entitled to consider, though cross-examination, the exact version of events for which he is taking responsibility.  Further, as this Court held in *Butler v. State*, 842 So. 2d 817, 825 (Fla. 2003), "we have often said that cross-examination is not limited to the exact details testified to on direct examination but extends to the whole subject and all matters that modify, supplement, contradict, rebut or make clearer the direct testimony." *Id*. (citing *Chandler v. State*, 702 So. 2d 186 (Fla. 1997); *see also Geralds v. State*, 674 So. 2d 96 (Fla. 1996)).  Thus, the trial judge was not in error in warning that any attempts to introduce evidence of remorse expressed during his confession might entitle the State to inquire as to other portions of the statement (as did, in fact, occur during the *Spencer* hearing).  Further, Troy has essentially presented this Court with a hypothetical situation of what might have happened but, because Troy chose not to take the risk and testify before the jury, did not actually occur.  Accordingly, we conclude that the trial judge's actions did not constitute error. [FN8]

> FN8.  It is important to note that in his final sentencing order, the judge relied only upon the statements of remorse and responsibility as expressed to Detective Gr[o]doski in determining the final aggravators and mitigators. He concluded:
>
> By using the police interview to prove mitigating evidence, the court ruled the defense had opened the door for the State to qualify, explain, limit or rebut the claim of remorse and to

introduce evidence of additional aggravators using the same confession. *See Ramirez v. State*, 739 So. 2d 568 (Fla. 1999). However, while such a ruling appears to be an appropriate discretionary one under section 90.108(1) of the Florida Evidence Code, as well as under general concepts of evidentiary door opening, the legal precedent for it in a death penalty case is not clear.

Accordingly, in an admitted abundance of caution, and solely as a matter of law, the court has elected to deny the State any advantage from its use. The case for the death penalty in Mr. Troy's case will stand or fall on its own, independently, based on the other evidence without consideration of the facts disclosed in defendant's confession to Officer Gr[o]doski.

*Troy v. State*, 948 So. 2d at 647-50.

The Supreme Court has not recognized a constitutional right to allocution. *McGautha v. California*, 402 U.S. 183, 218 n.22 (1971) ("This Court has not directly determined whether or to what extent the concept of due process of law requires that a criminal defendant wishing to present evidence or argument presumably relevant to the issues involved in sentencing should be permitted to do so."), *judgment vacated on other grounds by Crampton v. Ohio*, 408 U.S. 941 (1972). *See also Hill v. United States*, 368 U.S. 424, 429 (1962) (leaving open the question of a defendant's right to allocution). Federal habeas relief for a person in custody pursuant to the judgment of a state court is available only on the ground that the custody violates the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a). *See also Wainwright v. Goode*, 464 U.S. 78 (1983) ("[F]ederal courts may intervene in the state judicial process only to correct wrongs of a constitutional dimension."); *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("[I]t is not the province of a federal habeas court

41

to reexamine state-court determinations on state-law questions.").   Because the right of allocution is not a constitutional right guaranteed by due process, it is not a cognizable claim in a federal habeas petition.  *See, e.g., United States v. Fleming*, 849 F.2d 568, 569 (11th Cir. 1988) (citations omitted) ("[T]he right to allocution is not constitutional."); *Scrivener v. Tansy*, 68 F.3d 1234, 1240 (10th Cir. 1995) ("A trial court's failure to afford a defendant the right of allocution raises neither a jurisdictional nor a constitutional error cognizable in habeas.").   Troy cites no federal law establishing a constitutional right to allocution before a jury without being subject to cross-examination.   Absent a constitutional basis, Troy cannot show that the state court's denial of relief on this ground was contrary to, or an unreasonable application of, federal law.[11]  28 U.S.C.§ 2254(d)(1).  *See also United States v. Barnette*, 211 F.3d 803, 820 (4th Cir. 2000) (finding that a criminal defendant does not have a constitutional right to make an unsworn statement of remorse before the jury that is not subject to cross-examination); *United States v. Hall*, 152 F.3d 381, 396 (5th Cir. 1998)

---

[11] Troy in his reply relies upon *Lockett v. Ohio*, 438 U.S. 586 (1978), *Eddings v. Oklahoma*, 455 U.S. 104 (1982), and *Skipper v. South Carolina*, 476 U.S. 1 (1986), to support his argument that the constitutional principle "that the sentencer may not be prevented from considering relevant mitigating evidence applies to the Florida penalty jury and not just the judge." (Doc. 29, p. 38).  In *Lockett* and *Eddings* the sentencer was precluded from considering certain mitigating evidence.   *"Lockett* and its progeny stand only for the proposition that a State may not cut off in an absolute manner the presentation of mitigating evidence, either by statute or judicial instruction, or by limiting the inquiries to which it is relevant so severely that the evidence could never be a part of the sentencing decision at all." *Johnson v. Texas*, 509 U.S. 350, 361 (1993) (quoting *McKoy v. North Carolina*, 494 U.S. 433, 456 (1990) (Kennedy, J., concurring)).  The state trial court in Troy's case did not preclude Troy from presenting mitigating evidence to either the judge or the jury in the penalty phase.  That Troy faced a proverbial "Hobson's choice" between taking the stand before the jury and being subject to cross-examination or not taking the stand to express remorse does not establish a federal constitutional violation.

(same), *abrogated on other grounds by United States v. Martinez-Salazar*, 528 U.S. 304 (2000).

**Grounds Four and Six**

Troy contends in ground four that the state trial court violated his Eighth Amendment right to a fair and reliable penalty phase and his Fourteenth Amendment right to due process by excluding, over Troy's objection, the testimony of Assistant Warden Michael Galemore. Troy asserts in ground six petition that the Florida Supreme Court's affirmance of the denial of relief on his claim of ineffective assistance of counsel for not adequately preparing Galemore to testify at the penalty phase violates his Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights.

    A.    <u>Trial court error</u>

Troy claims that Galemore's testimony was relevant to the mitigating factor of his potential for rehabilitation and positive contribution in a structured prison environment and that Galemore's testimony was necessary to rebut the prosecutor's repeated suggestion that Troy, if sentenced to life imprisonment, would resume using drugs.

Counsel during the penalty phase proffered Galemore's testimony as follows:

This is Michael Galemore.  He is an employee of the Department of Corrections.  He has not had personal contact with the defendant nor does he know any of the facts of this particular case.

The defense proposes to call Mr. Galemore to address some of the following issues:  The fact that if the defendant were sentenced to life imprisonment without possibility of parole, that that would be considered close custody . . .; that under close custody, the inmate would be supervised in a particular fashion; that the inmate would work in prison; that the inmate would have to

follow the rules of the prison; he would address the issue of drugs in prison; and he would address the issue of leadership in prison by an inmate; the fact that a specific leader is prohibited by the rules, but the Department of Corrections encourages positive leadership when it can be found.

Your Honor, I have also marked as a composite exhibit, Defendant's Exhibit Q, which is the Department of Corrections web page describing, or putting aside common misperceptions about prison life, most common being, A, that inmates don't work in prison, B, that they have access to satellite and cable T.V., C, that prisons are air-conditioned, and D, that inmates who are sentenced to life don't really serve life.  Mr. Galemore is well qualified to address all of these issues.

And another area, that if the court permitted I would ask, is what would the conditions of confinement be on death row?  The answer expected would be that you are basically locked into your cell and you don't work.

My authority, Your Honor, for seeking to present this testimony is first, the American Bar Association in February 2003 published guidelines for the performance of counsel in death penalty cases.  These guidelines include a recommendation that counsel call witnesses who can testify about the applicable alternative to a death sentence, and/or the conditions under which the alternative sentence would be served.

My second authority, Your Honor, is *Ford v. State*, 802 So. 2d 1121, Florida Supreme Court, 2001.  The court ruled that the alternative punishment to death is life imprisonment without parole, was not mitigating and gave it no weight. We disagree.  Parole relates to the circumstances of the offense and reasonably being made - - excuse me, Your Honor, and reasonably may serve as a basis for imposing a sentence less than death.

Then there are some footnotes, footnote 37, for instance, where the defendant is well suited to imprisonment, life imprisonment may serve as a viable alternative to death.  But where the defendant poses a threat to prison personnel and fellow inmates, life imprisonment may be viewed less favorably.

I also remind the court that the prosecution has suggested that inmates have sort of unlimited - - I'm not gonna [sic] - - strike that - - that inmates have access to drugs in the Department of Corrections and Mr. Galemore would be prepared to briefly address that issue.

(Doc. 17, Ex. A30, pp. 2726-29) (emphasis added).

The prosecutor in response to this proffer argued that Galemore's testimony "doesn't really add anything to these proceedings" and that his testimony did not support any statutory or non-statutory mitigating factor. The prosecutor further highlighted that Galemore had never met Troy and did not know where Troy would be incarcerated if he received a life sentence. (Doc. 17, Ex. A30, pp. 2729-30).

The state trial court judge ultimately precluded Galemore from testifying:

The defendant has provided the case of *Ford v. State*, 802 So. 2d 1121, Florida Supreme Court case from 2001. This is one of the cases that I have in my library if we ever get to the sentencing order, because it's very helpful advice to trial judges concerning how to help fair [sic] those.

In the *Ford* case, what was at issue was a review of the judge's written sentencing order. In that case the defense had proposed that a non-statutory factor involved in that case, that an alternative punishment to death is life imprisonment without parole, was being argued as a mitigating factor. The judge in that case indicated that he did not believe it was mitigating in nature and gave it no weight.

The Supreme Court disagreed with that part of the sentencing order indicating that it was harmless error, indicating that parole eligibility is mitigating in nature because it relates to [the] circumstance of the offense and reasonably may serve as a basis for imposing a sentence less than death.

It goes on to say that while this factor is mitigating in nature, it may or may not be mitigating to the facts in the case at hand. That is for the trial court to determine. But in any event, they found it was harmless error.

The case does not really seem to stand for the proposition that the defendant is allowed to introduce the type of testimony that [he] has proffered here through the witness, proposed witness Galemore. It is clear under this case that the defense is allowed to argue to the jury that a potential parole ineligibility is in fact a mitigating factor and it is a non-statutory one, and they would certainly be allowed to argue that in this case in light of the judge's

instructions that they have to choose between life imprisonment without parole or death. But it doesn't stand for the proposition that the evidence of this type is permitted.

The case goes on to cite, and I think I'm citing from page 1136, it cites to the *Walker v. State* case, a 1997 case, where they make the statement, quote, "We conclude that Walker was afforded what Florida and U.S. Supreme Court case law deems sufficient; i.e., the opportunity to argue to the jury potential parole ineligibility as a mitigating factor." I don't think any defendant [sic] proof on that is necessary. I think that is certainly proper argument based upon the law and the instructions the jury will receive and will be within the parameters of the defendant to make such an argument if they feel it's appropriate.

It's also a factor, a non-statutory one, which the court would have to consider if and when it ever gets to a sentencing order.

There's also an additional footnote here that states, quote, "For instance where the defendant is well suited to imprisonment, life imprisonment may serve as a viable alternative to death, but whether the defendant poses a threat to prison personnel and fellow inmates, life imprisonment may be viewed less favorably." So certainly evidence which tends to prove or disprove that he poses a threat to prison personnel and other inmates, or that he is well suited to imprisonment, are issues that are properly presented to the jury, but I don't find that the testimony as proffered in regards to witness Galemore address[es] those issues, and he doesn't have any knowledge of this particular defendant, and I don't think his testimony would be relevant or probative for those reasons.

So I'm going to grant the State's motion to exclude him as a witness for those reasons and make those findings here on the record as a matter of law.

(Doc. 17, Ex. A30, pp. 2762-65) (emphasis added).[12]

---

[12] Counsel also filed a written mitigation proffer detailing the mitigation evidence that he was unable to present to the jury, including testimony from Galemore about Department of Corrections policies and procedures. (Doc. 17, Ex. A6, pp. 986-87).

Troy raised on direct appeal a federal Eighth and Fourteenth Amendment challenge to the trial court's exclusion of Galemore as a mitigation witness. The Florida Supreme Court rejected this ground:

> Troy's next claim involves the exclusion of the proffered testimony of Department of Corrections official Michael Galemore, an assistant warden at the Polk County Correctional Institution. He asserts that this exclusion violated the Eighth and Fourteenth Amendments because Galemore's testimony was relevant to the mitigating factor of Troy's potential for rehabilitation and positive contribution in a structured prison environment.
>
> According to the trial records, defense counsel planned to call Galemore to testify that, hypothetically, were Troy sentenced to life imprisonment, it would be considered close custody, that Troy would be supervised in a particular fashion, and that he would work while in prison. Galemore was also to testify regarding the presence of drugs in prison, specifically that they are not easily obtained. The trial judge granted the State's motion to exclude him as a witness, emphasizing that Galemore had no personal knowledge of the defendant or the case.
>
> The trial judge made clear that defense counsel still had the right to argue potential parole ineligibility to the jury as a mitigating factor, to present evidence as to whether Troy would pose a threat to prison personnel or other inmates, and to argue whether he was well-suited to imprisonment. Defense counsel made use of all of these options, presenting witnesses in mitigation regarding Troy's behavior in prison, [FN9] and arguing during closing that, if the jury chose life imprisonment, "John Troy will be in prison until the day he dies."
>
>> FN9. Troy called eight witnesses during the penalty phase to testify as to his general good behavior in prison, stretching back to his first periods of incarceration in Tennessee beginning at age eighteen.
>
> A trial court's ruling on the admission of evidence is reviewed by an appellate court under an abuse of discretion standard. *Randolph v. State*, 853 So. 2d 1051, 1062 (Fla. 2003) ("The admissibility of evidence lies in the sound discretion of the trial court and trial court decisions will be affirmed absent a showing of abuse of discretion.").

We conclude that the trial court did not abuse its discretion in excluding Galemore's testimony. First, it should be noted that Galemore's testimony was offered during the penalty phase of Troy's trial, which lasted over four and a half days. Defense counsel called twenty-nine witnesses during this phase, indicating that the judge was not categorically excluding mitigation evidence or the presentation of defense witnesses. Furthermore, Galemore had never met Troy, nor had he ever witnessed Troy during one of his periods of incarceration, making his potential assessment regarding Troy's possible prison experience entirely speculative. When considered in context of the entire penalty phase, the other witnesses called, and the arguments defense counsel nevertheless made regarding a possible life sentence, the exclusion of Galemore as a witness was not an abuse of discretion.

*Troy v. State*, 948 So. 2d at 650-61.

"[T]he Eighth and Fourteenth Amendments require that the sentencer in a capital case consider any evidence which mitigates against the imposition of the death penalty." *Glock v. Moore*, 195 F.3d 625, 637 (11th Cir.1999) (citing *Lockett v. Ohio*, 438 U.S. 586, 608 (1978)). *See also Eddings v. Oklahoma*, 455 U.S. 104 (1982) (same). However, "[n]othing . . . limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Lockett*, 438 U.S. at 604 n.12. *See also Davis v. Branker*, 305 Fed. App'x 926, 937 (4th Cir. 2009) ("*[L]ockett* and its progeny [do not] compel the conclusion that a state court is required to present a capital jury with *any* evidence the defendant proffers as mitigating, no matter how irrelevant, unreliable, or cumulative, or that a state's normal evidentiary rules must always yield to allow the introduction of such evidence[.]").

Here, Galemore, a witness counsel acknowledged was unacquainted with Troy and who had no knowledge of Troy's behavior while incarcerated, would have testified generally

48

about the availability of drugs in a close custody prison setting.  Galemore's testimony would not have addressed Troy's character, his prior record, or the circumstances of Troy's crimes. *Lockett*, 438 U.S. at 604 n.12.  Galemore's testimony was properly excluded by the state trial court applying the Florida Rules of Evidence.[13]  Troy fails to demonstrate that the state court's preclusion of Galemore's testimony resulted in a violation of his federal rights under the Eighth and Fourteenth Amendments.[14]

B.  <u>Ineffective assistance for not preparing Galemore to testify</u>

Troy contends that his trial counsel rendered ineffective assistance during the penalty phase by not properly and adequately preparing Galemore to testify, which error resulted in the state trial court precluding Galemore from testifying before the jury.  Specifically, Troy argues that counsel should have arranged for Galemore to meet Troy and to review both Troy's prior prison records and the testimony of the eight other witnesses who testified in the

---

[13] Troy in his reply also relies upon *Skipper v. South Carolina*, 476 U.S. 1 (1986), and *Simmons v. South Carolina*, 512 U.S. 154 (1994), to support his argument that the state trial court should have allowed Galemore to testify generally about prison conditions and the availablity of drugs in close custody.  *Skipper*, 476 U.S. at 4-8, holds that the Eighth Amendment and the Due Process Clause dictate that evidence of a defendant's good behavior while in prison to illustrate his temperament and adaptability to prison life cannot be excluded from the jury's consideration in the penalty phase of a capital trial.  *Simmons*, 512 U.S. at 156, holds that where a defendant's future dangerousness is at issue, and state law prohibits his release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible.  The preclusion of Galemore's testimony about the availibility of drugs in prison was not a crucial issue in determining Troy's sentence and did not keep any mitigating evidence out of the effective reach of the jury. Troy does not demonstrate a violation of either *Skipper* or *Simmons*.

[14] Alternatively, even assuming that the state trial court committed an error of constitutional magnitude by precluding Galemore's testimony, the error was harmless.  Under the harmless error standard articulated in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), habeas relief is granted only if the error "had a substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  Troy fails to show that any error in precluding Galemore's testimony caused a substantial and injurious effect upon the jury's sentencing recommendation.

penalty phase about Troy's good behavior in prison.  Troy asserts that Galemore could then

"have been presented as a ranking DOC witness familiar with the defendant and his case,

thereby overcoming the court's emphasized basis for the proffer ruling."  (Doc. 1, p. 22).

Troy claims that if counsel had properly prepared and presented Galemore's testimony, a

reasonable probability exists that the jury would not have recommended a death sentence and

that the state trial court judge would not have imposed a death sentence.

The state post-conviction court rejected this ground in Troy's Rule 3.851 motion.[15]

The Florida Supreme Court affirmed the denial:

> Troy first claims that counsel was ineffective for failing to prepare Department of Corrections official Michael Galemore as a penalty-phase mitigation witness.  He points to this Court's opinion on direct appeal where we considered whether the trial court erred in excluding Galemore's proffered testimony.  *Troy*, 948 So. 2d at 650.  There, we concluded that the trial court did not abuse its discretion in excluding this testimony, noting, *inter alia*, that "Galemore had never met Troy, nor had he ever witnessed Troy during one of his periods of incarceration, making his potential assessment regarding Troy's possible prison experience entirely speculative."  *Troy*, 948 So. 2d at 651.  Troy now contends that trial counsel was ineffective for failing to properly prepare Galemore with personal knowledge of Troy in order to make it

---

[15]  The state post-conviction court held:

[T]he Defendant argues that he was denied effective assistance of counsel when his attorney failed properly and adequately to prepare a mitigation witness, Michael Galemore, which led to the exclusion of his testimony.  In support thereof, he cites to the Supreme Court's opinion on his direct appeal, wherein the court indicated that the trial court did not abuse its discretion in excluding Mr. Galemore's testimony because, *inter alia*, "Galemore had never met Troy, nor had he ever witnessed Troy during one of his periods of incarceration, making his potential assessment regarding Troy's possible prison experience entirely speculative."  *Troy*, 948 So. 2d at 651.  The State, on the other hand, argues that the Defendant's trial counsel was not ineffective and, that in any event, Mr. Galemore's exclusion did not prejudice the outcome of the case.  The State's position is correct.  Defendant's motion on this point is DENIED.

(Doc. 17, Ex. C5, March 3, 2009, order denying Rule 3.851 motion, p. 3).

possible for him testify about the defendant's prison experience should he be sentenced to life imprisonment without the possibility of parole.  According to Troy, competent counsel would have arranged for Galemore to meet and interview the defendant; review the defendant's prior prison records; and review the penalty phase testimony of the eight witnesses who testified to Troy's prison behavior.  Had Galemore acquired such personal knowledge, Troy maintains, he would have been able to draw upon Troy's past experience to project what his future prison experience would be while serving a life sentence without the possibility of parole.  He contends further that an evidentiary hearing on the matter was warranted.  We disagree.

First, a defendant's claim that he was denied effective assistance of counsel because of counsel's failure to present mitigation evidence will not be sustained where the jury was aware of most aspects of the mitigation evidence that the defendant claims should have been presented.  *See Van Poyck v. State*, 694 So. 2d 686, 692-93 (Fla. 1997) (holding that trial counsel was not deficient in the presentation of defendant's life history during the penalty phase because the jury was aware of most aspects of the defendant's life that the defendant argued should have been presented).  We conclude that in this case the jury was aware of many aspects of parole ineligibility and possible prison experience that Troy now contends should have been presented.

Troy maintains that while there was evidence about his past prison behavior, testimony from a disinterested witness such as Galemore could have addressed his probable future conduct should he receive a life sentence without the possibility of parole, in accord with the U.S. Supreme Court's decision in *Skipper v. South Carolina*, 476 U.S. 1, 106 S. Ct. 1669, 90 L. Ed. 2d 1 (1986), and this Court's decision in *Valle v. State*, 502 So. 2d 1225 (Fla. 1987).  However, the record reflects that several witnesses testified as to how Troy could make positive contributions should he be sentenced to life imprisonment without the possibility of parole.  While much of the testimony on the defendant's probable future conduct came from close family members, the record reflects that other witnesses testified to Troy's future prison behavior.  We also note that the trial court addressed parole ineligibility during the penalty phase, instructing the jury that gain time does not apply when a defendant is sentenced to life in prison without the possibility of parole.

Second, we have held that a defendant's claim that he was denied effective assistance of counsel because of counsel's failure to present witnesses in mitigation will not be sustained where the sentencing judge was aware of many of the mitigating factors that the defendant claims on appeal should have

been presented.  *See Lightbourne v. State*, 471 So. 2d 27, 28 (Fla. 1985) (holding that counsel was not ineffective for failing to present mitigating evidence at sentencing because the trial record clearly indicated that the sentencing judge was aware of many of the mitigators that counsel was presenting to this Court on appeal).  In this case, the record reflects that the sentencing judge considered Troy's "value to others inside of prison, the contributions he can make if sentenced to life in confinement, and his potential for rehabilitation" as a mitigating circumstance and accorded it little weight.  Because both the sentencing judge and the jury were aware of evidence relating to the defendant's parole ineligibility, counsel was not deficient for failing to prepare Galemore as a mitigation witness as Troy maintains.

Additionally, trial counsel's alleged deficiency in failing to prepare Galemore as a mitigation witness to testify to Troy's possible prison experience did not prejudice his proceedings.  "Penalty phase prejudice under the *Strickland* standard is measured by whether the error of trial counsel undermines this Court's confidence in the sentence of death when viewed in the context of the penalty phase evidence and the mitigators and aggravators found by the trial court."  *Stewart v. State*, 37 So. 3d 243, 253 (Fla. 2010) (quoting *Hurst v. State*, 18 So. 3d 975, 1013 (Fla. 2009)).  That standard does not "require a defendant to show 'that counsel's deficient conduct more likely than not altered the outcome' of his penalty proceeding, but rather that he establish 'a probability sufficient to undermine confidence in [that] outcome.'"  *Porter v. McCollum*, ___ U.S. ___, 130 S. Ct. 447, 455-56, 175 L. Ed. 2d 398 (2009) (quoting *Strickland*, 466 U.S. at 693-94, 104 S. Ct. 2052).  Viewed in the context of this case, we conclude that the absence of further testimony presented to the jury discussing Troy's possible prison experience does not establish a probability sufficient to undermine our confidence in his sentence of death.  Because the record conclusively demonstrates that Troy is not entitled to relief, we uphold the lower court's summary denial of this ineffective assistance of counsel claim.  *See Hutchinson*, 17 So. 3d at 700.

*Troy v. State*, 57 So. 3d 828, 834-36 (Fla. 2011).

To warrant relief on an ineffective assistance of counsel claim at the penalty phase, Troy must show both deficient performance and that the deficient performance "prejudiced the defense such that, without the errors, there is a reasonable probability that the balance of aggravating and mitigating circumstances would have been different."  *Bolender v.*

*Singletary*, 16 F.3d 1547, 1556-57 (11th Cir. 1994) (citing *Strickland,* 466 U.S. at 687).

"[W]hen a petitioner contends that the presentation of additional mitigating evidence would have changed the weighing process so that death is not warranted, 'we look at the mitigating circumstance evidence that was not presented, along with that which was, and consider the totality of it against the aggravating circumstances that were found.'" *Hardwick v. Crosby*, 320 F.3d 1127,  1133 (11th Cir. 2003).  "Because 'it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight,' *Bell v. Cone*, 535 U.S. 685, 702 (2002), we must make 'every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Lawhorn v. Allen*, __ F.3d __, 2008 WL 638596 at *16 (11th Cir. 2008) (citing *Strickland*, 466 U.S. at 689).

Troy fails to demonstrate a reasonable probability that the proposed mitigating evidence he suggests should have been presented during the penalty phase through Michael Galemore, weighed against the aggravating evidence, would have resulted in a life sentence had the state trial court judge and jury heard Galemore's testimony.[16]  Troy has not shown that the Florida Supreme Court's resolution of this claim was contrary to or an unreasonable application of *Strickland*, or that the denial of relief was based on an unreasonable

---

[16]  The jury voted eleven to one in favor of the death penalty.  (Doc. 17, Ex. A6, p. 1013).  The state trial court judge in his sentencing order stated that "[t]he court has examined all potential mitigating evidence in the record, whether or not it was advanced by the defendant," and concluded that "the aggravating circumstances far outweigh the mitigating ones beyond and to the exclusion of any reasonable doubt."  (Doc. 17, Ex. A10, p. 1645).

determination of the facts in light of the evidence presented in the penalty phase proceedings. 28 U.S.C. § 2254(d).

**Ground Five**

Troy contends that both Florida's death penalty statute and the procedure by which he was sentenced to death are constitutionally invalid in light of *Ring v. Arizona*, 536 U.S. 584 (2002). Troy's challenge is predicated upon the principle that "the jury reaches a penalty verdict which is accorded great weight by the judge and is usually determinative of the outcome, but the jury as a whole makes no specific findings as to aggravating (or mitigating) factors, nor is jury unanimity required as to the aggravating factors and . . . it is the judge who makes the findings of the statutory aggravating factors." (Doc. 1, p. 20).

The Florida Supreme Court rejected this ground on direct appeal:

> Troy next argues that Florida's death penalty statute is unconstitutionally invalid because it does not require the findings of each aggravating factor to be made by the jury, pursuant to *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002). This Court has denied relief in appeals where the trial judge has found the "during the course of a felony" aggravator. *See Robinson v. State*, 865 So. 2d 1259, 1265 (Fla. 2004) ("This Court has held that the aggravators of murder committed 'during the course of a felony' and prior violent felony involve facts that were already submitted to a jury during trial and, hence, are in compliance with *Ring*.") (citing *Owen v. Crosby*, 854 So. 2d 182, 193 (Fla. 2003)). Given that Troy was convicted of this crime simultaneously with two counts of armed burglary, two counts of armed robbery, and attempted sexual battery, relief on this *Ring* claim is denied.

*Troy v. State*, 948 So. 2d at 653-54.

*Ring*, 536 U.S. at 609, holds that aggravating factors that justify an increase in the maximum punishment for first-degree murder from life imprisonment to death become

54

elements of a greater offense and must be found to exist beyond a reasonable doubt by a jury. *Ring* has not affected Florida's capital sentencing scheme because Florida's capital sentencing procedures do not create the Sixth Amendment error identified in *Ring*.  Notwithstanding, Troy in his replies (Doc. 23, pp. 14-20; Doc. 29, pp. 53-60) relies heavily upon *Evans v. Fla. Dep't of Corr.*, Case No. 2:08-cv-14402, a case from the Southern District of Florida in which the federal district court granted habeas relief under 28 U.S.C. § 2254 upon Evans's challenge to the constitutionality of Florida's death penalty statute under *Ring*, the same argument that Troy presents in his federal petition.  The Eleventh Circuit has since reversed the district court's granting of relief, holding that Florida's death penalty statute does not, in fact, violate *Ring*.  *Evans v. Sec'y, Fla. Dep't of Corr.*, 699 F.3d 1249 (11th Cir. 2012).

Troy fails to establish any entitlement to federal habeas relief based upon the state court's ruling rejecting his constitutional challenge to Florida's death penalty statute.  Under the AEDPA, Troy bears the responsibility for demonstrating that the state court's determination resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States.  Troy fails to carry this burden on this ground.

**Ground Seven**

Troy contends that the state post-conviction court violated his Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights by summarily denying his claim of ineffective assistance of counsel based upon counsels' failure during the penalty phase to adequately investigate and question jurors who had undisclosed connections with Bonnie Carroll's

family.  Specifically, Troy argues that juror Fred Hamblin and Bonnie Carroll's father, Bob Ortiz, were both active in the Siesta Key Chamber of Commerce and that Hamblin worked for a real estate agency located close to the Chamber of Commerce.  Troy claims that "[t]he seating of jurors with undisclosed connections with the victim . . . constituted fundamental error violating [his] right to a fair trial [as] guaranteed by state and federal due process." (Doc. 1, p. 24).

Troy also claims that the jury foreperson "was so overcome with sympathy for the victim's mother that she was unable to conform her behavior to the dictates of the court and the law when she was moved to embrace [Bonnie Carroll's mother] and comfort her during the penalty phase.  Additionally, the entire jury sought and obtained permission to take a group photograph.  A jury with the high degree of camaraderie would have been vulnerable to being unduly influenced by Hamblin and the [jury foreperson]."  (Doc. 1,p. 27).  Troy asserts that counsel failed to ascertain the level of Hamblin's knowledge and potential bias and failed to discover that the jury foreperson's sympathy for Bonnie Carroll's family improperly "intruded into the panel as a whole."

The state post-conviction court rejected the ineffective assistance claim.[17]  The Florida

---

[17]  The state post-conviction court rejected this ground:

[T]he Defendant argues that he was denied effective assistance of counsel by failing adequately to investigate and question a juror, Juror Hamblin, who had allegedly undisclosed connections with the victim's family.  In support thereof, the Defendant states that Juror Hamblin was actively involved in the Siesta Key Chamber of Commerce and conducted his real estate business a block from the Chamber and that the victim's father, who had been selected as the Chamber Treasurer in August 2003, was also active in the Siesta Key Chamber of Commerce.  He additionally notes that the Hamblin and Ortiz families both lived on Siesta Key, which is a geographically small and confined area of about 7,000 residents.  According to the Defendant, there is a substantial likelihood that the victim's father knew Juror Hamblin and that his attorney should have questioned Juror Hamblin about this fact.

An ineffective assistance claim based on alleged failure to question or challenge a juror may be the basis for post-conviction relief.  *See Mungin v. State*, 932 So. 2d 986, 996 (Fla. 2006) (addressing claim of ineffective assistance for "accepting the jury without objection").  A review of the record in this case shows that during jury selection, the court specifically asked the venire if anyone was familiar with the victim or members of her family.  Juror Hamblin did not speak up at this time.  He did, however, speak up when asked whether he had read anything about the case:

COURT:        [ . . . ] Have any of you before today seen or heard anything about this case? . . . All right.  Let me make sure I have the names here.  Mr. Hamblin.

Hamblin:        Yes.

[ . . . .]

COURT:        Mr. Hamblin, thank you for letting us know that you may have seen something about the case beforehand. [ . . . ] Can you share with us what that may have been?

HAMBLIN:        I think yesterday in the Herald.  I saw a headline about it but I'm erring on the side of caution by mentioning it.  I think I saw it.  I didn't read the article.  I think it was yesterday but I couldn't be certain.

COURT:        Can you recall anything about the article?

HAMBLIN:        The only thing I recall, and I don't know whether I read it or my wife told me that it was the first major trial in Sarasota in years, but no, I don't.

(continued...)

[17](...continued)

| | | |
|---|---|---|
| COURT: | Have you formed any impression one way or the other about the case? | |

HAMBLIN:   No.

COURT:   All right.  And that's the only exposure you had to the situation?

HAMBLIN:   Yes.  I don't normally read the Herald that much.

COURT:   Well. Okay.  All right [prosecutor], any questions?

[PROSECUTOR]:   No questions.

COURT:   Defense?

[COUNSEL]:   Morning, Mr. Hamblin.  You say you don't read the Herald that much.  Is that your typical practice?

HAMBLIN:   Yes.  We get the Herald because my wife likes to read it.  I read the Wall Street Journal and then I read the classifieds in the Herald because I'm looking for a boat.

[COUNSEL]:   Do you ever watch any of the local news channels?

HAMBLIN:   We haven't had television on or the VCR in a year.

[COUNSEL]:   Apart from yesterday's article, there may have been other articles over the last year or so.  Do you think you've seen any of those?

HAMBLIN:   Not to my recollection.

[COUNSEL]:   At this point in time, do you feel like you have any outside knowledge about the case, other than what you've heard here in the courtroom?

HAMBLIN:   No.

In addition to acknowledging that he had no outside knowledge of the case, Juror Hamblin later indicated that he was open to hearing the facts and circumstances of the case.  The court notes that Juror Hamblin also explained during voir dire that he had a friend of his brother's that committed suicide as a result of the pressures of life, that he had taken Prozac, and that he previously worked at a center that worked with adults that had had difficulty with drugs or alcohol in helping them get their GED.

(continued...)

Supreme Court affirmed on appeal the state post-conviction court's denial:

> Troy next raises two sub-claims alleging trial counsel's ineffective assistance during voir dire, which, in his view, warranted an evidentiary hearing. First, Troy claims counsel was deficient for failing to question juror Fred Hamblin about his alleged undisclosed connection with the family of the murder victim, Carroll. Second, he asserts that counsel was ineffective for not moving to strike juror Hamblin from the jury panel. He also alleges other juror misconduct in this case. Each sub-claim is addressed below.
>
> Troy first contends that counsel did not adequately question juror Hamblin during voir dire about whether he knew the murder victim's father, Robert ["]Bob["] Ortiz. Troy asserts that trial counsel should have discovered a connection between the two men because both were members of the same local chamber of commerce and both lived and worked in the same community. Troy's claim that there is a substantial likelihood that juror Hamblin knew the victim's father is refuted by the record. The voir dire record reveals that the trial judge questioned prospective jurors about whether they knew the victim or the victim's family. It is true that when the court asked whether any prospective jurors knew the victim or the victim's family, the court provided the victim's maiden name, Ortiz, as the middle name; and it might have been more prudent for the court to have read aloud to prospective jurors the names of the victim's immediate family members. However, it is reasonable to conclude that had Hamblin known Carroll's family, as Troy maintains, Hamblin would have realized the familial relation between the victim and Ortiz. Moreover, the court prefaced the question with the following: "If you are like most people, you may recognize a name later on. It may ring a bell

---

[17](...continued)
The allegation that Juror Hamblin knew the victim's family is speculative and as such, the court must deny the claim. *See Green v. State*, 975 So. 2d 1090, 1104-05 (Fla. 2008) (rejecting defendant's claim that there would have been a basis for a for cause challenge as to [a] particular juror if counsel had followed up during voir dire with more specific questions because, *inter alia*, the claim was speculative); *Knight v. State*, 923 So. 2d 387, 394) (Fla. 2005) (rejecting defendant's claim that appellate counsel was ineffective for failing to challenge trial court's refusal to individually voir dire prospective jurors regarding views on the death penalty because the claim was based on nothing but speculation that the jurors were influenced by the comments of a prospective juror). Defendant's counsel's performance was well within the *Strickland* standard. Defendant's motion on this ground is DENIED.

(Doc. 17, Ex. C5, March 3, 2009, order denying Rule 3.851 motion, pp. 7-9) (footnotes and court's record citations omitted).

with you.  If so, bring it up."  Troy also maintains that there was a likelihood that Hamblin recognized Ortiz, as the victim's father attended the trial proceedings and testified during the penalty phase.  This assertion is entirely speculative.  At no point during the course of the proceedings did Hamblin indicate that he knew the victim's family.

Any suggestion on Troy's behalf that juror Hamblin concealed information from the court during voir dire is unsupported by the record.  The record reflects that Hamblin was candid and forthcoming in his responses during voir dire and disclosed information of which he believed the court should be aware. Additionally, we note that although an evidentiary hearing was not granted on the matter, the court did conduct an interview with juror Hamblin in open court.[18]  At this interview, both Hamblin and Ortiz testified that they did not know one another. For these reasons, we deny relief on this subclaim.

In his second sub-claim, Troy asserts that trial counsel was deficient for failing to strike juror Hamblin from the jury panel, and that the post-conviction court erred in failing to address this subclaim.  We disagree.  We conclude that even if the court did not address the issue, it is unnecessary to remand this claim for a ruling because the claim is refuted by the record.

Troy claims that counsel was deficient for not challenging juror Hamblin during voir dire.  He claims further that the allegedly hostile nature of the victim's father provided an additional basis for challenging juror Hamblin during jury selection.  Counsel's alleged failure to exercise a cause challenge or a peremptory challenge to strike a prospective juror is subject to the prejudice standard set forth in *Carratelli v. State*, 961 So. 2d 312, 324 (Fla. 2007).  *See Owen*, 986 So. 2d at 549-50.  To be entitled to relief, the defendant must establish that a juror was actually biased.  *Carratelli*, 961 So. 2d at 324.  We explained in *Carratelli*:

> A juror is competent if he or she "can lay aside any bias or prejudice and render his verdict solely upon the evidence presented and the instructions on the law given to him by the court."  Therefore, actual bias means bias-in-fact that would prevent service as an impartial juror.  Under the actual bias

---

[18] While his Rule 3.851 motion was pending, Troy moved to interview Fred Hamblin.  (Doc. 17, Ex. C4, pp.680-86).  The state post-conviction court granted the motion contemporaneous with its order denying the Rule 3.851 motion and subsequently conducted a hearing at which Hamblin testified about his familiarity with Bob Ortiz.  (Doc. 17, Ex. C7, pp. 1305-07; Ex. C8, transcript of April 22, 2009, hearing, pp. 35).

standard, the defendant must demonstrate that the juror in question was not impartial - i.e., that the juror was biased against the defendant, and the evidence of bias must be plain on the face of the record.

*Carratelli*, 961 So. 2d at 324 (citations omitted) (quoting *Lusk v. State*, 446 So. 2d 1038, 1041 (Fla. 1984)).

We conclude that the record in this case refutes any claim of actual bias. The voir dire record reveals that Hamblin came forward when asked whether he had come across any information concerning the case. Hamblin indicated he had not formed any impression about the case and had no outside knowledge about the case except for a possible newspaper headline he may have seen the day before jury selection began. Hamblin also indicated he was open to hearing the facts and circumstances of the case and that he was "willing to serve and give [the court] the benefit of [his] opinion and [his] verdict." The fact that juror Hamblin and the victim's father, Ortiz, shared an affiliation with the same professional organization and lived and worked in the same community does not establish actual bias. Moreover, we conclude that the allegedly hostile nature of Ortiz before and throughout trial, which Troy maintains was apparent when Ortiz testified during the penalty phase, similarly fails to establish Hamblin's actual bias. Because the record refutes any claim of actual bias that would have prevented juror Hamblin from serving as an impartial juror, Troy is not entitled to relief.

With regard to Troy's allegations of other juror misconduct, we conclude that Troy is procedurally barred from raising a claim that the jury was repeatedly compromised in this case. "[A]ny substantive claim pertaining to juror misconduct is procedurally barred as it could have and should have been raised on direct appeal." *Elledge v. State*, 911 So. 2d 57, 77 n. 27 (Fla. 2005); see also *Knight v. State*, 923 So. 2d 387, 391 n.6 (Fla. 2005) (holding as procedurally barred an initial post-conviction claim alleging juror misconduct). A defendant may not attempt to circumvent the procedural bar to his claims by raising conclusory allegations of ineffective assistance of counsel. *See Miller v. State*, 926 So. 2d 1243, 1260-61 (Fla. 2006) (citing *Thompson v. State*, 796 So. 2d 511, 515 n. 5 (Fla. 2001)). Troy's claim that trial counsel "did nothing . . . to discover how much the demonstrative sympathy of a juror for the victim's family intruded into the panel as a whole" is an attempt to raise an issue of alleged juror misconduct as an ineffective assistance of counsel claim. We thus deny relief on this claim.

61

*Troy v. State*, 57 So. 3d at 836-38.

A.    Juror Hamblin

"The constitutional standard of fairness requires that the criminally accused have a panel of impartial, indifferent jurors." *Murphy v. Fla.*, 421 U.S. 794, 799 (1975).  "The purpose of voir dire is to ascertain whether potential jurors can render a verdict solely on the basis of evidence presented and the charge of the trial court." *Wilcox v. Ford*, 813 F.2d 1140, 1150 (11th Cir. 1987).  *See also J.E.B. v. Ala. ex rel. T.B.*, 511 U.S. 127, 143-44 (1994) ("Voir dire provides a means of discovering actual or implied bias and a firmer basis upon which the parties may exercise their peremptory challenges intelligently."); *Mu'Min v. Va.*, 500 U.S. 415, 431 (1991) ("Voir dire examination serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges."). "Voir dire plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981).

Effective assistance of counsel is required during voir dire. *Brown v. Jones*, 255 F.3d 1273, 1278-9 (11th Cir. 2001).  However, counsel's questions and tactics during voir dire are a matter of trial strategy.  *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001).  "A decision regarding trial tactics cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are shown to be 'so ill chosen that it permeates the entire trial with obvious unfairness.'" *Teague v. Scott*, 60 F.3d 1167, 1172 (5th Cir. 1995).  Because empaneled jurors are presumed impartial, *see Smith v. Phillips*, 455 U.S. 209, 215 (1982),

Troy must show that the juror selection process produced a juror that was actually biased against him to satisfy *Strickland's* prejudice prong. *Hughes*, 258 F.3d at 458. *See also Rogers v. McMullen*, 673 F.2d 1185, 1189 (11th Cir. 1982) (defendant's Sixth Amendment right to a fair and impartial jury was not violated absent a showing that a jury member hearing the case was actually biased against him).

Troy's ineffective assistance claim regarding Hamblin lacks merit. The record shows both that Hamblin had no connection with Bob Ortiz and that Hamblin did not harbor any bias or prejudice against Troy.[19] Troy fails to point to any record evidence establishing that

---

[19] Hamblin stated under oath during the interview before the state post-conviction court:

COURT:          Let me be a little more specific here. Prior to delivery of your verdicts in the case, did you know a Bob Ortiz or a Robert Ortiz?

HAMBLIN:        No, I did not.

COURT:          Were you a member of the Siesta Key Chamber of Commerce?

HAMBLIN:        Yes, I was.

. . . .

COURT:          You never attended the meetings themselves?

HAMBLIN:        I never attended the meetings.

. . . .

COURT:          We have Mr. Ortiz here. If you're like me, you might remember faces more than you do names. I'd like to bring him in just to see if there's any chance it might ring a bell with you, if you saw his face.

. . . .

[Robert Ortiz was brought into the courtroom.]

COURT:          Since the trial, have you had any contact with Bob Ortiz or Robert Ortiz?

(continued...)

Hamblin lacked the ability to be fair and impartial at trial.  Troy neither shows actual bias by

Hamblin nor establishes that if trial counsel had further investigated Hamblin before trial or

asked Hamblin additional questions during voir dire, the jury would have acquitted him in

the guilt phase or recommended a life sentence rather than death in the penalty phase.  *See*

*Strickland*, 466 U.S. at 694.  Troy fails to establish that the Florida Supreme Court either

unreasonably applied *Strickland* or unreasonably determined the facts in rejecting this

ineffective assistance claim.  *See Patton v. Yount*, 467 U.S. 1025 (1984) (state trial judge's

determination of an individual juror's impartiality is entitled to a presumption of correctness

on federal habeas review under 28 U.S.C. § 2254(d)).

     B.     <u>Other juror misconduct</u>

---

[19](...continued)

HAMBLIN:     Not that I'm aware of.

. . . .

COURT:     Okay. . . . Mr. Hamblin, you've seen Mr. Ortiz here and he's spoken for a few minutes.  Do you recognize this gentleman?

HAMBLIN:     No.

COURT:     Have you ever seen him before to your knowledge?

HAMBLIN:     You said he was at the trial so I must have seen him.  But I don't - - I wouldn't have known him if I saw him on the street.

COURT:     Okay.  Mr. Ortiz, since you're here, do you know this gentleman?

ORTIZ:     No.  I don't remember him from the trial even, to tell you the truth.  That was a long time ago.

(Doc. 17, Ex. C8, pp. 20, 22-23, 25).

To the extent that he asserts as a separate substantive basis for relief a claim other allegations of juror misconduct (based upon the jury foreperson's inappropriate contact with the victim's mother[20] or the jury's taking a group photograph), Troy is not entitled to relief. A state court's rejection of a petitioner's constitutional claim on a state procedural ground generally precludes federal habeas review of the claim. *Coleman v. Thompson*, 501 U.S. 722 (1991). *See also Caniff v. Moore*, 269 F.3d1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."). Accordingly, the Florida Supreme Court's express reliance upon an independent and adequate state procedural bar to reject Troy's remaining juror misconduct claim precludes federal review of this claim. *See LeCroy v. Sec'y, Fla. Dep't of Corr.*, 421 F.3d 1237, 1260 (11th Cir. 2005) "([T]he State 3.850 Court's refusal to consider the defendant's assertion that the trial court's lock-up statement violated the Constitution as procedurally barred rested on an independent and adequate state ground that precludes federal habeas consideration of this issue."); *Eagle v. Linahan*, 279 F.3d 926, 936 (11th Cir. 2001) (citing *Coleman*, 501 U.S. at 729 ("It is a maxim well rooted in our federalist system that federal courts 'will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'").

---

[20] The jury foreperson inappropriately approached Bonnie Carroll's mother and hugged her outside the courtroom. This juror was subsequently removed from the jury before the penalty phase concluded. (Doc. 17, Ex. A35, pp. 3346-51).

Troy's failure to properly raise this claim in state court also renders the claim unexhausted for federal review purposes.  Before a federal court may grant habeas relief, a federal habeas petitioner must exhaust every available state court remedy for challenging his conviction, either on direct appeal or in a state post-conviction motion. 28 U.S.C. § 2254(b)(1)(A), (C); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).  "[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."  *Boerckel*, 526 U.S. at 842.  *See also Henderson v. Campbell*, 353 F.3d 880, 891 (11th Cir. 2003) ("A state prisoner seeking federal habeas relief cannot raise a federal constitutional claim in federal court unless he first properly raised the issue in the state courts.") (citations omitted)).  A federal habeas petitioner "shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question presented."  *Pruitt v. Jones*, 348 F.3d 1355, 1358 (11th Cir. 2003).

A state prisoner "'must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process,' including review by the state's court of last resort, even if review in that court is discretionary."  *Pruitt*, 348 F.3d at 1358-59 (quoting *Boerckel*, 526 U.S. at 845).  To exhaust a claim, a petitioner must present the state court with the particular legal basis for relief in addition to the facts supporting the claim.  *See Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) ("Exhaustion of state remedies requires that the state prisoner 'fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass

66

on and correct alleged violations of its prisoners' federal rights.'") (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995)).  The prohibition against raising an unexhausted claim in federal court extends to both the broad legal theory of relief and the specific factual contention that supports relief.  *Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1344 (11th Cir. 2004).

Troy failed to present on direct appeal the remaining substantive juror misconduct claim that he now presents in his federal petition.  Consequently, he deprived the state courts of a "full and fair opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  *Boerckel*, 526 U.S. at 845.  A federal court cannot grant a Section 2254 petition unless the petitioner has exhausted every available state court remedy.  *Snowden*, 135 F.3d at 735.  Troy's failure to present a federal claim on direct appeal leaves the exhaustion requirement unsatisfied.  *Henry*, 513 U.S. at 365.

Troy cannot return to state court to present a federal claim challenging the alleged juror misconduct.  Because he could have raised and preserved a federal constitutional claim on direct appeal, state procedural rules preclude Troy from asserting such a claim collaterally in a Rule 3.851 motion.  *See e.g. Childers v. State*, 782 So. 2d 946, 947 (Fla. 4th DCA 2001) ("The law is clear that where an issue could have been raised on direct appeal, it is not the proper subject for a Rule 3.850 motion.") (citations omitted).  The state procedural rules also preclude a second direct appeal.  Consequently, the remaining juror misconduct claim presented in ground seven is procedurally defaulted.

Pursuant to the procedural default doctrine, "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is applicable." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). To establish cause for a procedural default, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). *See also Murray v. Carrier*, 477 U.S. 478 (1986). To show prejudice, a petitioner must demonstrate not only that the errors at his trial created the possibility of prejudice but that they worked to his actual and substantial disadvantage and infected the entire trial with error of constitutional dimensions. *United States v. Frady*, 456 U.S. 152 (1982). In other words, he must show at least a reasonable probability of a different outcome. *Henderson*, 353 F.3d at 892; *Crawford v. Head*, 311 F.3d 1288, 1327-28 (11th Cir. 2002).

A petitioner may obtain federal habeas review of a procedurally defaulted claim, without a showing of cause or prejudice, if review is necessary to correct a fundamental miscarriage of justice. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Carrier*, 477 U.S. at 495-96. A fundamental miscarriage of justice occurs in an extraordinary case where a constitutional violation has probably resulted in the conviction of someone who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *Henderson*, 353 F.3d at 892. This exception requires a petitioner's "actual" innocence. *Johnson v. Alabama*, 256 F.3d 1156,

1171 (11th Cir. 2001).  To meet this standard, a petitioner must show a reasonable likelihood of acquittal absent the constitutional error.  *Schlup*, 513 U.S. at 327.

Troy fails to demonstrate cause and prejudice excusing his default.  *Carpenter*, 529 U.S. at 451; *Carrier*, 477 U.S. at 495-96.  He neither alleges nor shows that the fundamental miscarriage of justice exception applies.  *Henderson*, 353 F.3d at 892.  Because Troy fails to proffer specific facts showing an exception to procedural default, his remaining substantive juror misconduct claim in ground seven is procedurally barred from federal review.

**Ground Eight**

Troy contends that the state post-conviction court erred by denying an evidentiary hearing on Troy's claim that his lethal injection under Florida's state procedures violates his Eighth and Fourteenth Amendment rights because lethal injection is cruel and unusual punishment.  Troy argues that Florida's "method of execution and the training and procedures create a substantial and objectively intolerable risk of harm."  (Doc. 1, p. 29).  Troy asserts that a "reasonably feasible alternative" to lethal injection exists that includes using either a single barbiturate or another alternative drug that does not include a paralytic component. He argues the state post-conviction court "should have held an evidentiary hearing to address the potential issue of his venous access, a factual question essential to an individualized determination of whether lethal injection can be constitutionally administered to him."  (Doc. 1, pp. 29-30).  Troy further argues that the state post-conviction court should have taken

69

testimony from veterinarians and others experienced in euthanasia and allowed testimony

about the training, identity, and experience of the actual executioners.

The state post-conviction court rejected the ineffective assistance claim.[21] The Florida

Supreme Court affirmed on appeal the state post-conviction court's denial:

> Troy criticizes Florida's current lethal injection protocols and contends that the lower court should have granted an evidentiary hearing to address the potential issue of his venous access, to hear evidence on the training, experience and identity of the actual executioners, and to hear the testimony of veterinarians and others experienced in euthanasia to determine whether a reasonably feasible alternative exists to Florida's current method of execution.
>
> We reject Troy's claim that an evidentiary hearing was required to determine whether a reasonably feasible alternative to Florida's current lethal injection protocol exists.  Much like the petitioners in *Baze v. Rees*, 553 U.S. 35, 128 S. Ct. 1520, 170 L. Ed. 2d 420 (2008), Troy proposes that Florida adopt a single barbiturate or other alternative that does not include a paralytic.  The plurality in *Baze* rejected the barbiturate-only protocol, and concluded:
>
> > A stay of execution may not be granted on grounds such as those asserted here unless the condemned prisoner establishes that the State's lethal injection protocol creates a demonstrated risk of severe pain.  He must show that the risk is substantial when compared to the known and available alternatives.  A State

---

[21]  The state post-conviction court held:

Defendant argues that Florida's procedures, training, and method of lethal injection are unconstitutional, as they "create a substantial and objectively intolerable risk of harm."  He asks the court to evaluate this claim in light of the recent United States Supreme Court decision of *Baze v. Rees*, 128 S. Ct. 1520 (2008).  Even assuming this claim was properly raised in this motion, the court denies the claim.  *See Ventura v. State*, ___ So. 2d ___, 2009 WL 196379, *4-6 (Fla.) (holding that *Baze* does not set a different or higher standard for lethal injection claims than *Lightbourne*"); *Henyard v. State*, 992 So. 2d 120, 129-30 (Fla. 2008) (*Baze* does not alter Florida's standard to review Eighth Amendment challenges); *Lightbourne v. McCollum*, 969 So. 2d 326 (Fla. 2007); *Schwab v. State,* 969 So. 2d 318 (Fla. 2007).  The motion as to this ground is therefore DENIED.

(Doc. 17, Ex. C5, March 3, 2009, order denying Rule 3.851 motion, pp. 12-13) (footnote omitted).

with a lethal injection protocol substantially similar to the
protocol we uphold today would not create a risk that meets this
standard.

*Id*. at 61, 128 S. Ct. 1520.  Because Florida employs the same three-drug
combination under similar protocols as those examined in *Baze*, any
suggestion on Troy's part that the State's failure to adopt an alternative
constitutes cruel and unusual punishment is without merit.  Additionally, we
stated in *Lightbourne v. McCollum*, 969 So. 2d 326 (Fla. 2007):

> Determining the specific methodology and the chemicals to be
> used are matters left to the DOC and the executive branch, and
> this Court cannot interfere with the DOC's decisions in these
> matters unless the petitioner shows that there are inherent
> deficiencies that rise to an Eighth Amendment violation.

*Id*. at 352.  Troy has failed to demonstrate any "inherent deficiencies that rise
to an Eighth Amendment violation."  *Id*.  Instead, he reiterates many of the
same alleged deficiencies in Florida's lethal injection protocols that were
presented in *Lightbourne* and subsequent cases.  The deficiencies he alleges
in the current protocols include that the protocols fail to require adequate and
reliable background screening of the execution team and other personnel; fail
to require that the execution team and the medical personnel who perform
lethal injection have appropriate training, credentials, and supervision; fail to
require adequate record-keeping and an adequate review and certification
process; fail to require a proper execution facility and method; and fail to
require adequate standards to manage complications inherent in the procedure.

We have rejected several claims identical to those Troy now raises.  *See Burns
v. State*, 3 So. 3d 316 (table), No. SC08-192 (Fla. Jan. 29, 2009); *Lightbourne*,
969 So. 2d 326; *Tompkins v. State*, 994 So. 2d 1072, 1082 (Fla. 2008).  As to
the remaining claims that were not duplicated in *Lightbourne*, we conclude
that Troy is not entitled to relief under the analogous and comprehensive
analysis we undertook in *Lightbourne*.  "A claim that the protocol can be
improved and the potential risks of error reduced can always be made."
*Lightbourne*, 969 So. 2d at 351.  However, "this Court's role is not to
micromanage the executive branch in fulfilling its own duties relating to
executions."  *Id*.  Therefore, an evidentiary hearing was not warranted on
Troy's proposed barbiturate-only protocol. For similar reasons, we also reject
Troy's contention that an evidentiary hearing was warranted on the training,
experience, and identity of the execution team.

71

We also hold that any suggestion on Troy's part that *Lightbourne* and related decisions should be reconsidered in light of the U.S. Supreme Court's decision in *Baze* has been previously rejected by this Court. *See Ventura v. State*, 2 So.3d 194, 198-99 (Fla.), *cert. denied*, ___ U.S. ___, 129 S. Ct. 2839, 174 L. Ed. 2d 562 (2009).  Our extensive analysis in *Lightbourne* reasoned that Florida's current lethal injection protocol passes constitutional muster under any of the risk-based standards for evaluating the constitutionality of state execution protocols considered by the *Baze* Court.  *Ventura*, 2 So. 3d at 200. Further, "we have rejected contentions that *Baze* set a different or higher standard for lethal injection claims than *Lightbourne*." *Tompkins*, 994 So. 2d at 1081.

Lastly, Troy's claim that he was entitled to an evidentiary hearing to address any potential issues concerning venous access must also fail.  Conclusory allegations are not sufficient to establish a legally sufficient claim for post-conviction relief.   *See Freeman v. State*, 761 So. 2d 1055, 1061 (Fla. 2000).  Troy failed to allege a medical condition that would contribute to difficulty gaining venous access and he did not allege that such conditions exist.  *See id.*; *see also Spencer v. State*, 23 So. 3d 712 (table), No. SC08-2270 (Fla. Nov. 18, 2009).  Because this claim is legally insufficient, Troy is not entitled to relief.

*Troy v. State*, 57 So. 2d at 839-40.

To the extent that Troy argues that the state post-conviction court's failure to hold an evidentiary hearing on this ground warrants federal habeas relief, the claim is not cognizable on federal habeas review.  28 U.S.C. § 2254(a).  *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("[I]t is not the province of a federal habeas court to re-examine state-court determinations on state-law questions.").  A federal court is not the appropriate forum to challenge the process afforded in state collateral proceedings because the challenge attacks a proceeding collateral to the prisoner's confinement and not the confinement itself.  *Quince v. Crosby*, 360 F.3d 1259, 1261-62 (11th Cir. 2004) ("[W]hile habeas relief is available to address defects in a criminal defendant's conviction and sentence, an alleged defect in a

collateral proceeding does not state a basis for habeas relief."); *Spradley v. Dugger*, 825 F.2d 1566, 1568 (11th Cir. 1987) (a habeas claim that the state trial court violated a petitioner's due process rights because the court failed to conduct an evidentiary hearing and attach to its opinion pertinent portions of the record resolved only issues unrelated to the cause of petitioner's detention and stated no basis for habeas relief).  Even affording this claim a liberal construction and assuming that Troy asserts a federal due process violation for failure to conduct an evidentiary hearing, he cannot obtain relief because the claim is strictly a matter of state law.  *Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988); *Willeford v. Estelle*, 538 F.2d 1194, 1198 (5th Cir. 1976).[22]

To the extent that Troy asserts his substantive Eighth and Fourteenth Amendment challenge to the lethal injection procedure as a basis for relief, he fares no better.  In *Baze v. Rees*, 553 U.S. 35 (2008),[23] the Supreme Court upheld Kentucky's three-drug protocol (a protocol similar to Florida's lethal injection procedure) as not violative of the Eighth Amendment.  "Florida's lethal-injection protocol is substantially similar to that of Kentucky. This holding brings Florida's lethal-injection protocol squarely within the safe harbor created by the *Baze* plurality."  *Ventura v. Florida*, 2 So. 3d 194, 200 (Fla.), *cert. denied*, ___ U.S. ___, 129 S. Ct. 2839, 174 L. Ed. 2d 562 (2009).  An Eighth Amendment challenge fails if

---

[22]   Unless later superseded by Eleventh Circuit precedent, a Fifth Circuit decision issued before October 1, 1981, binds this court.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*).

[23]   Troy fails to provide any legal authority to support this ground.  To the extent that he relies upon his argument presented in his Rule 3.851 motion in which he relied upon *Baze*, this court evaluates the ground in light of *Baze* which is the appropriate controlling Supreme Court precedent.

a state's protocol is substantially the same as the protocol approved in *Baze*. *See Wellons v. Hall*, 554 F.3d 923, 942 (11th Cir.2009) (holding that *Baze* foreclosed both petitioner's Eighth Amendment challenge to Georgia's three-drug protocol and his claim that the state court erred by denying an evidentiary hearing on that claim), *vacated on other grounds*, ___ U.S. ___, 130 S. Ct. 727, 175 L. Ed. 2d 684 (2010); *Raby v. Livingston*, 600 F.3d 552, 560 (5th Cir.2010) ("We hold that the Texas Execution Procedure, as written and as administered, is within the safe harbor established by *Baze*." ); *Jackson v. Danberg*, 594 F.3d 210, 230 (3rd Cir.) ("The safeguards drafted into Delaware's new lethal injection protocol exceed those contained in the Kentucky protocol that seven Justices in *Baze* found constitutionally firm . . . ."), *cert. denied*, ___ U.S.___, 131 S. Ct. 458, 178 L. Ed. 2d 287 (2010); and *Emmett v. Johnson*, 532 F.3d 291, 300 (4th Cir.2008) ("[W]e conclude that Virginia's protocol is substantially similar to Kentucky's protocol and that Emmett has failed as a matter of law to demonstrate a substantial or objectively intolerable risk that he will receive an inadequate dose of thiopental, particularly in light of the training and safeguards implemented by Virginia prior to and during the execution process.").

Troy's prospective execution is neither cruel nor unusual. Troy fails to substantiate his allegation that Florida's lethal injection procedure creates a "substantial and objectively intolerable" risk of harm. "Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual." *Baze*, 553 U.S. at 50. Likewise, Troy cannot base a claim for habeas relief upon the possibility that execution

personnel, whether due to negligence or a lack of training, might improperly administer the first drug.  "Some risk of pain is inherent in any method of execution - no matter how humane - if only from the prospect of error in following the required procedure."  553 U.S. at 47.  Troy fails to show that the rejection of his Eighth and Fourteenth Amendment claim is an unreasonable application of *Baze*.

**Ground Nine**

Troy contends that the state post-conviction court erred by denying an evidentiary hearing on his claim that Section 945.10,[24] Florida Statutes, which prohibits Troy from knowing the identity of members of the execution team, violates his rights under the First, Fifth, Sixth, Eighth, and Fourteenth Amendments.  Troy argues that "concerns for the safety of those involved in executions and presumptions that the members of the executive branch will properly perform their duties in carrying out an execution [are] no longer valid in view of nationwide administrative problems and evolving standards of decency."  (Doc. 1, pp. 31-32).

---

[24] Section 945.10(1)(g) states:

(1) Except as otherwise provided by law or in this section, the following records and information held by the Department of Corrections are confidential and exempt from the provisions of s. 119.07(1) and s. 24(a), Art. I of the State Constitution:

. . . .

(g) Information which identifies an executioner, or any person prescribing, preparing, compounding, dispensing, or administering a lethal injection.

The state post-conviction court rejected the ineffective assistance claim.[25]  The Florida

Supreme Court affirmed on appeal the denial of relief:

> Troy next asserts that the post-conviction court erred in denying his request for
> an evidentiary hearing on the constitutionality of section 945.10, Florida
> Statutes.  He contends that the statute, which exempts the disclosure of the
> identity of an executioner from public records, is unconstitutional in part
> because it precludes him from determining the adequacy of the execution
> team's qualifications and training.  He advances that the safety of executioners
> does not justify the public records exemption and that the presumption that
> members of the executive branch will properly perform their duties in carrying
> out an execution, as recognized in *Provenzano v. State*, 761 So. 2d 1097, 1099
> (2000), is no longer valid.  For the reasons explained below, we deny relief on
> this claim.
>
> Rule 3.851 provides that an evidentiary hearing is required only on claims
> listed by the defendant as requiring a factual determination.  Fla. R. Crim. P.
> 3.851(f)(5)(A)(I).  Here, Troy bases his contentions specifically on the issues
> that arose out of the execution of Florida inmate Angel Diaz, the failed
> execution of Ohio inmate Rommel Broom, the botched executions of inmates
> in other states, the Report of the Governor's Commission on the
> Administration of Lethal Injection in Florida, and the evidentiary-hearing
> testimony considered by the circuit court in the *Lightbourne* proceedings.
> Nothing in this claim required a factual determination.  Furthermore, we have
> repeatedly rejected challenges to the constitutionality of section 945.10 on the
> merits.  *See Darling v. State*, 45 So. 3d 444, 448 (Fla. 2010) (citing *Ventura*,
> 2 So. 3d at 197 n. 3); *see also Henyard v. State*, 992 So. 2d 120, 130

---

[25]  The state post-conviction court held:

[T]he Defendant argues that § 945.10, Fla. Stat., which prohibits the disclosure of the
identity of the members of the execution team and the executioners, is unconstitutional
because it prohibits him from discovering the identities of his executioners, which he
contends precludes him from determining the adequacy of their qualifications and training.
The court denies the motion as to this ground.  *See Ventura v. State*, 2009 WL 196379, *2
n.3 (Fla.) (rejecting similar claim); *Henyard v. State*, 992 So. 2d 120, 130 (Fla. 2008) (same);
*Bryan v. State*, 753 So. 2d 1244, 1250-51 (Fla. 2000) (public records exemption contained
in section 945.10(g) is constitutional).

(Doc. 17, Ex. C5, March 3, 2009, order denying Rule 3.851 motion, p. 13) (footnote omitted).

(Fla. 2008) ("We previously found section 945.10 facially constitutional and decline to recede from our decision now.").

Additionally, even if the Court were willing to recede from this precedent, as of this date the Governor has not signed a death warrant for Troy; consequently, even if ordered to do so, the Department of Corrections could not state with any certainty who Troy's eventual executioners would be.  *Cf. Lightbourne*, 969 So. 2d at 343 ("[T]his Court [previously] stated that there is a presumption that the members of the executive branch will properly perform their duties in carrying out an execution.") (alterations in original) (quoting *Provenzano*, 761 So. 2d at 1099).  In light of our repeated rejection of challenges of this nature, the lower court did not err in denying an evidentiary hearing on this issue.  Accordingly, we deny relief on this claim.

*Troy v. State*, 57 So. 3d at 840-41.

Again, to the extent that Troy argues that the state post-conviction court's failure to hold an evidentiary hearing on this ground warrants federal habeas relief, the claim is not cognizable on federal habeas review.  28 U.S.C. § 2254(a).  *See also Estelle*, 502 U.S. at 67; *Quince*, 360 F.3d at 1261-62; *Spradley*, 825 F.2d at 1568.

To the extent that Troy asserts his substantive challenge to the constitutionality of Section 945.10, Florida Statutes, he cannot obtain relief.  Troy does not cite, and the court has not found, any Supreme Court precedent holding that a state statute prohibiting disclosure of the identity of a prison's execution team violates either the First, Fourth, Fifth, Sixth, Eighth, or Fourteenth Amendment.[26]  When no Supreme Court precedent is on point, or the precedent is ambiguous, it cannot be said that a state court's conclusion is contrary to clearly established federal law as determined by the United States Supreme Court.  *See* 28

---

[26]  Troy did not address this ground in either of his replies.  (Docs. 23, 29).

U.S.C.§ 2254 (d)(1).  *See also Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (finding that, because a state court of appeals' decision does not conflict with the reasoning or holdings of United States Supreme Court precedent, the decision is not "contrary to . . . clearly established Federal law"); *Dombrowski v. Mingo*, 543 F.3d 1270, 1274 (11th Cir. 2008) (same).  Consequently, Troy fails to meet his burden of proving that the state court unreasonably applied controlling Supreme Court precedent or unreasonably determined the facts in denying relief on this ground.  *See* 28 U.S.C. § 2254(d)(1), (2).

**Ground Ten**

Troy contends that the state post-conviction court erred by denying relief on his ground that Rule 4-3.5(d)(4) of the Rules Regulating the Florida Bar prohibiting counsel from interviewing jurors[27] violates equal protection principles and his rights under the First, Sixth, Eighth, and Fourteenth Amendments.  Specifically, Troy argues that the rule is unconstitutional because "it precludes counsel from investigating and presenting jury bias and misconduct that can only be discovered through interviews with jurors," but does not prohibit post-trial questioning of jurors by academic researchers, journalists, and lawyers not connected with the case.  (Doc. 1, pp. 33-34).  Troy claims that the rule denied him the adequate assistance of counsel in pursuing his post-conviction remedies.

---

[27] Rule 4-3.5(d)(4) states in relevant part:

A lawyer shall not ... after dismissal of the jury in a case with which the lawyer is connected, initiate communication with or cause another to initiate communication with any juror regarding the trial except to determine whether the verdict is subject to legal challenge; provided, a lawyer may not interview jurors for this purpose unless the lawyer has reason to believe that grounds for such challenge may exist.

The state post-conviction court rejected the ineffective assistance claim.[28]  The Florida

Supreme Court affirmed on appeal the state post-conviction court's denial:

> Troy challenges the constitutionality of rule 4-3.5(d)(4) of the Rules Regulating the Florida Bar on equal protection grounds and the sufficiency of the post-conviction order with regard to this claim.  As we explain below, relief is not warranted.

> Rule 4-3.5(d)(4) precludes a lawyer from initiating communication with any juror concerning a trial with which the lawyer is connected, "except to determine whether a verdict may be subject to legal challenge."  Under the rule, "a lawyer may not interview jurors for this purpose unless the lawyer has reason to believe that grounds for such challenge may exist."  R. Regulating Fla. Bar 4-3.5(d)(4).  Troy's constitutional challenge to this rule fails for two reasons.  First, this claim is procedurally barred because it should have been raised on direct appeal.[29]  *See Reese v. State*, 14 So. 3d 913, 919 (Fla. 2009) (citing *Israel v. State*, 985 So. 2d 510, 522 (Fla. 2008)).  Second, even if the claim was not procedurally barred, we have repeatedly rejected constitutional challenges to rule 4-3.5(d)(4).  *Id.* (citing *Barnhill v. State*, 971 So. 2d 106,

---

[28]  The state post-conviction court held:

[T]he Defendant argues that Rule 4-3.5(d)(4) of the Rules Regulating the Florida Bar is unconstitutional because criminal defense counsel are treated "differently, unfairly, and unequally compared to academics, journalists, and those lawyers not connected with a particular case."  Specifically, he argues that it is unconstitutional "[t]o the extent it precludes [] counsel from investigating and presenting jury bias and misconduct that can only be discovered through interviews with jurors . . . ."  The court denies this claim, as the Supreme Court "has repeatedly rejected challenges to the constitutionality of [R]ule 4-3.5(d)(4)."  *Evans v. State*, 995 So. 2d 933, 952 (Fla. 2008).  *See Barnhill v. State*, 971 So. 2d 106, 117 (Fla. 2007).

(Doc. 17, Ex. C5, March 3, 2009, order denying Rule 3.851 motion, p. 14) (footnote omitted).

[29]  The holding of the Florida Supreme Court that this ground could and should have been raised on direct appeal seems somewhat incongruous at first impression since Troy's argument is that the alleged unconstitutionality of the Florida rule hampered his counsel in the post-conviction (rather than the criminal trial) process.  The Florida Supreme Court was correct, however, because the legal argument was available on direct appeal regardless of the stage of the judicial proceedings at that time.  *See Duckett v. McDonough*, 701 F.Supp.2d 1245, 1274, n.31 (M.D. Fla. 2010).  Furthermore, any contention that the rule hampered post-conviction counsel carries no constitutional significance because there is no constitutional right to effective assistance of counsel in post-conviction collateral proceedings.  *Pennsylvania v. Finley*, 481 U.S. 551, 555-56 (1987).

117 (Fla. 2007)) (rejecting claim that rule 4-3.5(d)(4) violates a defendant's constitutional right of equal protection). "Furthermore, where the defendant merely complains about the 'inability to conduct "fishing expedition" interviews,' the claim is without merit." *Evans v. State*, 995 So. 2d 933, 952 (Fla. 2008) (quoting *Johnson v. State*, 804 So. 2d 1218, 1225 (Fla. 2001)). Thus, Troy is not entitled to relief on this subclaim.

Troy's challenge to the sufficiency of the lower court's order also fails. To support a lower court's summary denial of a post-conviction claim, rule 3.851 requires a lower court to disclose its basis for denying relief. *See Rose v. State*, 985 So. 2d 500, 503-04 (Fla. 2008). To do so, the court must either state its rationale or attach portions of the record that would refute the claims. *Id*. Troy challenges the post-conviction order for failing to explain why academics, journalists, and lawyers not connected to his case can conduct "fishing expedition" interviews while trial and post-conviction counsel are precluded from doing so. Although the lower court in the present case did not address this point in detail, the court did explain that the claim was denied because we have repeatedly rejected constitutional challenges to rule 4-3.5(d)(4). The lower court provided its rationale for denying relief on the constitutional challenge and, in doing so, sufficiently complied with rule 3.851. Accordingly, Troy is not entitled to relief as to this subclaim.

*Troy v. State*, 57 So. 3d at 841-42.

The Florida Supreme Court's express reliance upon an independent and adequate state procedural bar to reject Troy's substantive challenge to the constitutionality of a state procedural rule precludes federal review. *Harris v. Reed*, 489 at 262; *LeCroy*, 421 F.3d at 1260. Troy's failure to properly raise this claim in state court also renders the claim unexhausted for federal review purposes. Troy fails to demonstrate cause and prejudice excusing his default. *Carpenter*, 529 U.S. at 451; *Carrier*, 477 U.S. at 495-96. He neither alleges nor shows that the fundamental miscarriage of justice exception applies. *Henderson*, 353 F.3d at 892. Because Troy fails to proffer specific facts showing an exception to

procedural default, his constitutional challenge to Rule 4-3.5(d)(4) of the Rules Regulating the Florida Bar is procedurally barred from federal review.

Notwithstanding the procedural bar, Troy cannot obtain relief on this ground.  Troy fails to identify any Supreme Court precedent that either establishes a constitutional right to interview a juror or holds that a state procedural rule prohibiting an attorney from interviewing a juror post-trial violates a defendant's federal constitutional rights.  Moreover, rules that prevent attorney interviews or other contact with jurors, or preclude juror testimony where the subject inheres in the verdict itself have repeatedly been applied in criminal cases and held constitutional.  *See, e.g., Tanner v. United States*, 483 U.S. 107 (1987) (applying Federal Rule of Evidence 606(b) to exclude testimony of juror misconduct, including drug and alcohol use).  This ground warrants no relief because Troy fails to demonstrate the Florida Supreme Court's rejection of this ground was contrary to, or an unreasonable application of, established federal law.  *See* 28 U.S.C.§ 2254 (d)(1).

**Ground Eleven**

Troy presents two sub-claims for relief in this ground.  First, Troy contends that Section 921.141, Florida Statutes,[30] is facially vague and overbroad and that the "jury was

---

[30]  Section 921.41, Florida Statutes, provides in relevant part:

(2) **Advisory sentence by the jury.**  After hearing all the evidence, the jury shall deliberate and render an advisory sentence to the court . . . .

(3) **Findings in support of sentence of death.**  Notwithstanding the recommendation of a majority of the jury, the court, after weighing the aggravating and mitigating circumstances, shall enter a sentence of life imprisonment or death . . . .

(continued...)

unconstitutionally instructed by the court [during the penalty phase] that its role was merely advisory."  (Doc. 1, p. 35).  He further argues that "[t]he jury's sense of responsibility was diminished in this case by the misleading comments and instructions regarding the jury's role."  Troy asserts that this diminution violates both the Eighth and Fourteenth Amendments. Second, Troy claims that his trial counsel rendered ineffective assistance by not litigating this issue.

---

[30](...continued)
Fla. Stat. § 921.41(2), (3) (emphasis in original).

The state post-conviction court rejected this ground in Troy's Rule 3.851 motion.[31]

The Florida Supreme Court affirmed on appeal the state post-conviction court's denial:

> Troy is not entitled to relief on this claim for two reasons.  First, Troy is
> procedurally barred from raising this claim.  Although the trial record reflects
> that Troy filed a pretrial objection to the use of the standard jury instruction,
> Troy failed to raise this claim on direct appeal.  Consequently, his *Caldwell*
> claim is procedurally barred.  *See Hitchcock v. State*, 991 So. 2d 337, 361 (Fla.
> 2008) (holding that the *Caldwell* claim is procedurally barred because it could
> have been raised on direct appeal but was not) (citing *Jones v. State*, 928
> So. 2d 1178, 1183 n. 5 (Fla. 2006)).  Second, Troy's claim that the trial court's
> instruction diminished the jury's sense of responsibility is meritless.  *See Card
> v. State*, 803 So. 2d 613, 628 (Fla. 2001) (holding as meritless a claim that the
> standard jury instructions which refer to the jury as advisory and refer to jury's
> verdict as a recommendation violate *Caldwell*).  Although the instructions

---

[31]  The state post-conviction court held:

[T]he Defendant makes two arguments:  (1) his jury was unconstitutionally instructed that
its role was merely "advisory," in violation of *Caldwell v. Mississippi*, 472 U.S. 320 (1985);
and (2) his attorney was ineffective for failing adequately to make this argument.  [FN].  A
review of the record shows that the jury was advised in accordance with the model jury
instructions.

> [FN].  The record reflects that defense counsel did, in fact, object to the use
> of the standard jury instructions.

Even assuming that this claim is properly raised in a post-conviction motion [FN], the court
denies it.  *See Jones v. State*, ___ So. 2d ___, 2008 WL 5333274, *13 (Fla.) (standard
penalty phase jury instructions fully advise the jury of the importance of its role, correctly
state the law, do not denigrate the role of the jury, and do not violate *Caldwell v. Mississippi*,
472 U.S. 320 (1985)); *Mendyk v. State*, 592 So. 2d 1076, 1080 (Fla. 1982) ("[w]hen jury
instructions are proper, the failure to object does not constitute a serious and substantial
deficiency that is measurably below the standard of competent counsel"), *receded from on
other grounds, Hoffman v. State*, 613 So. 2d 405 (Fla. 1992).

> [FN].  *See Jones v. State*, __ So. 2d __, 2008 WL 5333274, *12 (Fla.)
> ("claims challenging the constitutionality of Florida's capital sentencing
> procedures [must] be raised at trial and on direct appeal").

(Doc. 17, Ex. C5, March 3, 2009, order denying Rule 3.851 motion, pp. 14-15) (court's record citations
omitted).

provided during the penalty proceeding of Troy's trial are not identical to those instructions contained in Florida Standard Jury Instruction (Criminal) 7.11, the instructions given to the jury do not materially differ from Florida's standard jury instructions. *See Hitchcock*, 991 So. 2d at 361. We have repeatedly held that the standard jury instructions are in compliance with *Caldwell*. *See, e.g., Globe v. State*, 877 So. 2d 663, 674 (Fla. 2004). Accordingly, Troy's claim is without merit.

Troy's assertion that counsel was ineffective for failing to litigate the *Caldwell* claim also lacks merit. *See Farina v. State*, 937 So. 2d 612, 618 n. 5 (Fla. 2006) (rejecting as meritless a claim that counsel was ineffective for failing to object to comments and instructions that diminished the jury's sense of responsibility under *Caldwell*). As discussed above, trial counsel filed a pretrial objection to the use of the standard jury instruction. Furthermore, "counsel cannot be deemed ineffective for failing to raise meritless claims or claims that had no reasonable probability of affecting the outcome of the proceeding." *Farina*, 937 So. 2d at 618 n. 5 (quoting *Teffeteller v. Dugger*, 734 So. 2d 1009, 1023 (Fla. 1999)). Therefore, Troy's claim fails.

*Troy v. State*, 57 So. 3d at 842-43.

The Florida Supreme Court's express reliance upon an independent and adequate state procedural bar to reject Troy's substantive challenge to the constitutionality of Section 921.141 and his *Caldwell* claim precludes federal review. *Harris v. Reed*, 489 U.S. at 262; *LeCroy*, 421 F.3d at 1260. Troy's failure to properly raise this claim in state court also renders the claim unexhausted for federal review purposes. Troy fails to demonstrate cause and prejudice excusing his default. *Carpenter*, 529 U.S. at 451; *Carrier*, 477 U.S. at 495-96. He neither alleges nor shows that the fundamental miscarriage of justice exception applies. *Henderson*, 353 F.3d at 892. Because Troy fails to proffer specific facts showing an exception to procedural default, his constitutional challenge to the state statute and his *Caldwell* claim are procedurally barred from federal review.

Notwithstanding the procedural bar, the claim lacks substantive merit.[32]  *Caldwell* holds that "it is constitutionally impermissible for a death sentence to rest on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death lies elsewhere." *Caldwell v. Mississippi*, 472 U.S. at 328-29.  "The inquiry under *Caldwell* is whether comments made at trial 'mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision.'" *Stewart v. Dugger*, 877 F.2d 851, 854 (11th Cir. 1989) (quoting *Dugger v. Adams*, 489 U.S. 401, 409 (1989)).  To establish a *Caldwell* violation, a petitioner "necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994).

In Troy's case the state trial court judge instructed the jury during the penalty phase:

> Ladies and gentlemen of the jury, it is now your duty to advise the court as to what punishment should be imposed upon the defendant for his crime of first degree murder.  As you've been told, the final decision as to what punishment shall be imposed is the responsibility of the judge.  However, it is your duty to follow the law that will be given to you by the court and render to the court an advisory sentence based upon your determination as to whether sufficient aggravating circumstances exist to justify the imposition of the death penalty, and whether sufficient mitigating circumstances exist to outweigh any aggravating circumstance found to exist.  The law requires a judge to give great weight to your advisory sentence.  It is only under rare circumstances that the court could impose a sentence other than what you recommend.

---

[32]  Troy states that "misleading comments and instructions" diminished the jury's responsibility but cites no portion of the record to support his contention and fails to specify what comments or particular instruction he challenges.

(Doc. 17, Ex. A35, pp. 3437-38).   The state trial court judge in the remainder of the instructions reiterated the advisory nature of the jury's sentencing recommendation.   (Doc. 17, Ex. A35, pp. 3444-48).

Although not a verbatim recitation of the Florida Standard Jury Instructions, the instructions actually given to the jury in the penalty phase, as the Florida Supreme Court noted, do not materially differ from the standard instructions.   The Florida Supreme Court has recognized these instructions as properly describing the jury's role in Florida.   *Archer v. State*, 673 So.2d 17, 21 (Fla.), *cert. denied*, 519 U.S. 876 (1996) (Florida standard jury instructions adequately describe role to jury); *Pope v. Wainwright*, 496 So.2d 798, 805 (Fla. 1986), *cert. denied*, 480 U.S. 951 (1987)).

Troy fails to demonstrate that the jury was mislead about its role in sentencing or that its sense of responsibility was diminished in any way.   *Davis v. Singletary*, 119 F.3d 1471, 1482 (11th Cir. 1997) ("[R]eferences to and descriptions of the jury's sentencing verdict in this case as an advisory one, as a recommendation to the judge, and of the judge as the final sentencing authority are not error under *Caldwell*.   Those references and descriptions are not error, because they accurately characterize the jury's and judge's sentencing roles under Florida law.").   "Nothing was said which would imply to the jury that its recommendation was superfluous or that the importance of the jury's decision was lessened by the fact that it was only a recommendation."   *Harich v. Wainwright*, 813 F.2d 1082, 1101 (11th Cir.1987).  *See also, Johnston v. Singletary*, 162 F.3d 630, 644 (11th Cir.1998) ("Because we find that the prosecutor's and court's comments to the jury did not serve to diminish the jurors' sense

86

of involvement or responsibility with respect to Johnston's sentence, and because these same challenged remarks accurately described the jury's advisory role during a capital trial under Florida law, Johnston's *Caldwell* claim does not afford a basis for habeas relief."). The court notes the instruction given told the jury the law required the judge to give the jury's advisory sentence great weight. Troy fails to meet his burden of establishing that the Florida Supreme Court unreasonably applied controlling Supreme Court precedent or unreasonably determined the facts in rejecting this aspect of ground eleven. *See* 28 U.S.C. § 2254(d)(1), (2).

Troy's ineffective assistance claim fares no better. He argues only that "to the extent that trial counsel failed to litigate these issues, trial counsel was ineffective." (Doc. 1, p. 35). The record refutes this argument. Trial counsel filed written objections to the standard jury instructions and specifically raised a *Caldwell* challenge. (Doc. 17, Ex. C7, pp. 1270-71, 1274-75). Troy again fails to meet his burden of establishing that the Florida Supreme Court unreasonably applied controlling Supreme Court precedent or unreasonably determined the facts in rejecting this claim. *See* 28 U.S.C. § 2254(d)(1), (2). Ground eleven warrants no relief.

**Ground Twelve**

Troy contends that "Florida's capital sentencing statute in unconstitutional on its face and as applied for failing to prevent the arbitrary and capricious imposition of the death penalty and for violating the guarantee against cruel and unusual punishment in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and to the

corresponding provisions of the Florida Constitution." (Doc. 1, p. 37). Specifically, Troy argues (1) that execution by both electrocution and lethal injection impose unnecessary physical and psychological torture without commensurate justification, (2) Florida's death penalty statute fails to provide a standard of proof for determining that aggravating circumstances outweigh the mitigating factors and does not define "sufficient aggravating circumstances," (3) the capital sentencing statute does not sufficiently define for the trial judge's consideration each of the aggravating circumstances listed in the statute, (4) the capital sentencing procedure does not utilize independent re-weighing of aggravating factors and mitigating circumstances, (5) the aggravating circumstances in the Florida capital sentencing statute were applied in a vague and inconsistent manner, and (6) the systematic presumption of death is fatally offensive to the Eighth Amendment's requirement that the death penalty be applied only to the worst offenders. Troy further claims that "to the extent [that] this claim was not properly litigated at trial or on appeal, [he] received prejudicially ineffective assistance of counsel." (Doc. 1, p. 37).

The state post-conviction court rejected this ground in Troy's Rule 3.851 motion.[33]

The Florida Supreme Court affirmed on appeal the state post-conviction court's denial:

> Troy next asserts that Florida's capital sentencing statute fails to prevent the arbitrary and capricious imposition of the death penalty and violates the due process guarantees against cruel and unusual punishment. This claim, which Troy concedes he raises for preservation purposes, comprises several subparts: (1) execution by electrocution or lethal injection imposes unnecessary physical and psychological torture without commensurate justification; (2) the statute fails to provide any standard of proof for determining that aggravators outweigh mitigators; (3) the statute fails to define for the circuit court's consideration each of the aggravators listed in the statute; (4) the procedure does not allow the independent reweighing of aggravators and mitigators; (5) the aggravators have been applied in a vague and inconsistent manner; (6) the statute creates a "presumption of death" whereby if only one aggravator is present it can only be overcome by mitigating evidence so strong as to outweigh the aggravator; and (7) this "presumption of death" violates the Eighth Amendment in that the death penalty is not applied only to the worst offenders.
>
> Troy is procedurally barred from raising this claim because the claim could have and should have been raised on direct appeal, but he failed to do so. *See Miller*, 926 So. 2d at 1259-60; *see also Jones v. State*, 928 So. 2d 1178, 1182-83 n. 5 (Fla. 2006) (holding that similar claims challenging Florida's

---

[33] The state post-conviction court held:

The court finds that these issues should have been raised on appeal. Nevertheless, even assuming that these claims were properly raised in this motion, the court denies them. Each of these claims has been previously rejected by the Florida Supreme Court. *See, e.g., Ventura v. State*, ___ So. 2d ___, 2009 WL 196379, *3 (Fla.) (Noting repeated and consistent rejection of Eighth Amendment challenges to Florida's current lethal injection protocol); *Henyard v. State*, 992 So. 2d 120, 129-30 (Fla. 2008) (*Baze* does not alter Florida's standard to review Eighth Amendment challenges); *San Martin v. State*, 705 So. 2d 1337, 1350 n.5 (Fla. 1997) (concluding that weighing provisions in Florida's death penalty statute requiring the jury to determine "[w]hether sufficient mitigating circumstances exist which outweigh the aggravating circumstances found to exist" and the standard jury instruction thereon did not unconstitutionally shift the burden to the defendant to prove why he should not be given a death sentence).

(Doc. 17, Ex. C5, March 3, 2009, order denying Rule 3.851 motion, pp. 17-18) (footnote omitted).

death penalty statute are procedurally barred because they should have been raised on direct appeal). Moreover, we have previously held similar claims to be meritless. *See Miller*, 926 So. 2d at 1260 (rejecting as meritless a claim that aggravators have been applied in a vague and inconsistent manner); *Elledge*, 911 So. 2d at 78-79 n. 28 (rejecting claim that the death penalty statute fails to provide a standard for determining that aggravators outweigh mitigators, does not define "sufficient aggravating circumstances," and does not sufficiently define each of the aggravators); *Sochor*, 883 So. 2d at 789 (holding that defendant's claim that execution by electrocution or lethal injection constitutes cruel and unusual punishment is meritless); *Fotopoulos v. State*, 608 So. 2d 784, 794 n. 7 (Fla. 1992) (rejecting as meritless a claim concerning the lack of an independent reweighing of aggravators and mitigators and claim that Florida law unconstitutionally creates a presumption of death).

Lastly, Troy contends that he received ineffective assistance of counsel because trial counsel failed to properly preserve these issues. However, a defendant may not attempt to circumvent the procedural bar to his claims by raising conclusory allegations of ineffective assistance of counsel. *See Miller*, 926 So. 2d at 1260-61 (citing *Thompson*, 796 So. 2d at 515 n. 5). Furthermore, "[t]rial counsel cannot be deemed ineffective for failing to raise meritless claims or claims that had no reasonable probability of affecting the outcome of the proceeding." *Teffeteller*, 734 So. 2d at 1023. Accordingly, Troy is not entitled to relief on this claim.

*Troy v. State*, 57 So. 3d at 843-44.

A.    Substantive challenge to state statute

The Florida Supreme Court's express reliance upon an independent and adequate state procedural bar to reject Troy's substantive challenges to the constitutionality of a state statute precludes federal review.[34] *Harris v. Reed*, 489 at 262; *LeCroy*, 421 F.3d at 1260. Troy's

_____

[34] Substantive challenges to Florida's death penalty statute similar to those Troy presents have been rejected. *See Proffitt v. Florida*, 428 U.S. 242, 255-56 (1976) (upholding constitutionality of Florida's death penalty statute against multiple challenges, including challenge based on vagueness and overbreadth of aggravating and mitigating circumstances and the lack of guidance for the jury in weighing such factors); *Lugo v. State*, 845 So. 2d 74, 119 (Fla. 2003) (reiterating that this Court has "rejected the claim that the death penalty system is unconstitutional as being arbitrary and capricious because it fails to limit the class of (continued...)

90

failure to properly raise this claim in state court also renders the claim unexhausted for federal review purposes. Troy fails to demonstrate cause and prejudice excusing his default. *Carpenter*, 529 U.S. at 451; *Carrier*, 477 U.S. at 495-96. He neither alleges nor shows that the fundamental miscarriage of justice exception applies. *Henderson*, 353 F.3d at 892. Because Troy fails to proffer specific facts showing an exception to procedural default, his constitutional challenges to the state statute are procedurally barred from federal review.

      B.    <u>Ineffective assistance of trial counsel</u>

The Florida Supreme Court, having determined that the substantive claims in this ground lacked merit, concluded that trial counsel was not ineffective for failing to preserve these meritless issues. Troy does not present evidence demonstrating either deficient performance or resulting prejudice to substantiate his ineffective assistance claim. Troy fails to meet his burden of establishing that the Florida Supreme Court unreasonably applied controlling Supreme Court precedent or unreasonably determined the facts in rejecting this ground. *See* 28 U.S.C. § 2254(d)(1), (2).

**Ground Thirteen**

Troy contends that the cumulative effect of the procedural and substantive errors in both the guilt phase and the penalty phase "virtually dictated the sentence of death" and

---

[34](...continued)
persons eligible for the death penalty"); *Freeman v. State*, 761 So. 2d 1055, 1067 (Fla. 2000) (rejecting as meritless the argument that the same felony underlying a felony murder conviction "cannot be used as an aggravating factor"); *Fotopoulos v. State*, 608 So. 2d 784, 794 n.7 (Fla. 1992) (rejecting as meritless claim regarding the lack of an independent reweighing of aggravating and mitigating factors). Troy claims likewise lack merit.

deprived him of a fundamentally fair trial under the Fourth, Fifth, Sixth, Eighth, and

Fourteenth Amendments.

The state post-conviction court rejected the ineffective assistance claim.[35] The Florida

Supreme Court affirmed on appeal the state post-conviction court's denial:

> Troy contends that he was denied a fundamentally fair trial based on
> cumulative errors that occurred.  We have held:
>
>> Where multiple errors are discovered in the jury trial, a review
>> of the cumulative effect of those errors is appropriate because
>> "even though there was competent substantial evidence to
>> support a verdict . . . and even though each of the alleged errors,
>> standing alone, could be considered harmless, the cumulative
>> effect of such errors [may be] such as to deny to defendant the
>> fair and impartial trial that is the inalienable right of all litigants
>> in this state and this nation."
>
> *McDuffie v. State*, 970 So. 2d 312, 328 (Fla. 2007) (alterations in original)
> (quoting *Brooks v. State*, 918 So. 2d 181, 202 (Fla. 2005)).  However, where
> the allegations of individual error are procedurally barred or meritless, a claim
> of cumulative error also fails.  *See Israel*, 985 So. 2d at 520 (citing *Parker v.
> State*, 904 So. 2d 370, 380 (Fla. 2005)).  Here, . . . the alleged errors he raises
> are either procedurally barred, meritless, or do not meet the *Strickland* standard
> for ineffective assistance of counsel.  Therefore, Troy's last claim must fail.

*Troy v. State*, 57 So. 3d at 844.

"Without harmful errors, there can be no cumulative effect compelling reversal."

*United States v. Barshov*, 733 F.2d 842, 852 (11th Cir. 1984), *cert. denied*, 469 U.S. 1158

---

[35] The state post-conviction court held:

The court denies this ground.  *See Downs v. State*, 740 So. 2d 506, 509 n.5 (Fla. 1999) (claim
of cumulative error is without merit where no other errors alleged by defendant were
sufficient to warrant an evidentiary hearing).

(Doc. 17, Ex. C5, March 3, 2009, order denying Rule 3.851 motion, p. 18).

(1985).  *See also United States v. Culver*, 598 F.3d 740, 751 (11th Cir. 2010) (doctrine of cumulative trial error does not apply where the trial court commits no individual errors); *Conklin v. Schofield*, 366 F.3d 1191, 1210 (11th Cir. 2004) ("[T]he court must consider the cumulative effect of [the alleged errors] and determine whether, viewing the trial as a whole, [petitioner] received a fair trial as is [his] due under our Constitution.") (quoting *United States v. Blasco*, 702 F.2d 1315, 1329 (11th Cir. 1983)).  Because each of Troy's individual claims of error lacks merit, no cumulative prejudicial effect results from the alleged errors. *See Spears v. Mullin*, 343 F.3d 1215, 1251 (10th Cir. 2003) ("Because the sum of various zeroes remains zero, the claimed prejudicial effect of [trial counsel's] cumulative errors does not warrant habeas relief."); *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir.) ("The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief."), *amended on other grounds*, 307 F.3d 459 (6th Cir. 2002), *cert. denied*, 538 U.S. 947 (2003).

In sum, Troy fails to meet his burden of proving that the state court either unreasonably applied controlling Supreme Court precedent or unreasonably determined the facts in rejecting  this ground.  *See* 28 U.S.C. § 2254(d)(1), (2).

### Evidentiary hearing

This case warrants no evidentiary hearing because "it plainly appears from the face of the motion and any annexed exhibits and the prior proceedings in the case that the movant is not entitled to relief."  *Broadwater v. United States*, 292 F.3d 1302, 1303 (11th Cir. 2003).

It is therefore **ORDERED AND ADJUDGED** that Troy's petition for the writ of habeas corpus (Doc. 1) is **DENIED**.  The Clerk is to enter judgment for Respondent and close this case.

## CERTIFICATE OF APPEALABILITY AND LEAVE TO APPEAL IN FORMA PAUPERIS DENIED

IT IS FURTHER ORDERED that Troy is not entitled to a certificate of appealability. A prisoner seeking a motion to vacate has no absolute entitlement to appeal a district court's denial of his motion. 28 U.S.C. § 2253(c)(1).  Rather, a district court must first issue a certificate of appealability (COA).  *Id*.  "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  *Id*. at § 2253(c)(2).  To make such a showing, Troy "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'"  *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)).  Troy has not made the requisite showing in these circumstances.  Finally, because

Troy is not entitled to a certificate of appealability, he is not entitled to appeal in forma pauperis.

**DONE** and **ORDERED** in Tampa, Florida on January 2, 2013.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

<u>Copies furnished to:</u>
Counsel/Parties of Record

F:\Docs\2011\11-cv-796 deny 2254 Troy.wpd

95